PLATZER, SWERGOLD, KARLIN, LEVINE
GOLDBERG & JASLOW, LLP
Proposed Attorneys for the Debtor
1065 Avenue of the Americas, 18th Floor
New York, New York 10018
Telephone: (212) 593-3000
Facsimile: (212) 593-0353
Henry G. Swergold, Esq.
Clifford A. Katz, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                    CHAPTER 11

BACHRACH ACQUISITION, LLC,                 Case No. 09-12918

              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF BRIAN LIPMAN IN SUPPORT OF CHAPTER 11
### PETITION AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

Under 28 U.S.C. § 1476, Brian Lipman, declares as follows under the penalty of

perjury:

1.     I am the Chief Executive Officer of Bachrach Acquisition, LLC

("Bachrach" or the "Company"), a limited liability company organized under the laws of

the state of New York. I have served as Chief Executive Officer of the Company since

approximately June 2006, and am familiar with the Debtor's day-to-day operations,

business affairs, and books and records.

### I. INTRODUCTION

2.     On the date hereof (the "Petition Date"), the Debtor commenced a chapter

11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11

of title 11 of the United States Code (the "Bankruptcy Code").

3.     I am authorized to submit this Declaration in support of the Debtor's chapter 11 petition and the first day pleadings described herein. I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case.

4.     I have reviewed the Debtor's first day applications and motions (the "First Day Motions") and proposed orders ("Proposed Orders") and am familiar with the facts alleged and the relief requested therein. The purposes of the First Day Motions include, among other things, to: (a) enable the Debtor to operate effectively, ease the Debtor's transition into Chapter 11 and mitigate the adverse effects of the Chapter 11 filing; (b) allow for the efficient and orderly administration of the Debtor's case; and (c) provide the Debtor with a "breathing spell" from aggressive creditor action. Each of the First Day Motions is crucial to the Debtor's transition into Chapter 11 and preservation of the Debtor's estate and assets.

5.     Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary course of my responsibilities as Chief Executive Officer of the Company and, if called as a witness, would testify thereto.[1]

---

[1] Certain of the disclosures herein relate to matters within the knowledge of other employees of the Debtor and are based on information provided by them.

## II. FACTUAL BACKGROUND

### A. General Overview of the Debtor's Business

6. The Debtor is a specialty retailer of men's clothing and accessories with forty-nine (49) stores located in Illinois, Indiana, Michigan, Virginia, Texas, Tennessee, Wisconsin, Pennsylvania, Georgia, Oklahoma, Kansas, Maryland, New Jersey, New York and Missouri. As of the Petition Date, the Debtor employs four hundred sixty-five (465) full and part-time employees.

7. The Debtor's fiscal year ends on December 31st. For the fiscal year ending December 31, 2008, the Debtor had net sales of $46,919,320.83, cost of sales of $19,380,410.85 and payroll and operating expenses of $38,249,166.04, for a loss of $10,710,256.06.

8. For the fiscal year ending December 31, 2007, the Debtor had net sales of $44,720,345.56, cost of sales of $15,985,074.18 and payroll and operating expenses of $32,602,666.58, for a loss of $3,867,395.20.

9. As of March 31, 2009, the Debtor's books and records reflect assets totaling approximately $23,446,377.96 in net book value, unsecured debt of approximately $12,778,476.37 and secured debt of approximately $7,473,539.00.

10. The Debtor commenced its business by acquiring most of the assets from the estate of Bachrach Clothing, Inc. through a 363 sale in the matter "In re: Bachrach Clothing, Inc.", case number 06-06525, filed with the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) in June 2006.

### B. The Debtor's Pre-Petition Secured Debt

11. Wells Fargo Bank, National Association acting through Wells Fargo

Business Credit Operating Division ("Wells Fargo"), is the Debtor's pre-petition secured lender. The Debtor and Wells Fargo are parties to the following pre-petition loan documents: a certain Revolving Note and Credit and Security Agreement, dated as of January 12, 2007 ("Pre-Petition Credit Agreement"), as amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, and (ii) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of Wells Fargo, including, without limitation, the security agreements, notes, guarantees, mortgages, and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto (collectively, the "Pre-Petition Loan Documents").

12.    As of May 6, 2009, the Debtor was indebted to Wells Fargo on account of the obligations pursuant to the Pre-Petition Loan Documents, in the aggregate amount of approximately $6,202,302.30 for principal, accrued interest, fees and costs.

### III.  FACTORS PRECIPITATING THE DEBTOR'S CHAPTER 11 FILING

13.    The circumstances leading to the Debtor's filing of this Petition under chapter 11 of the Bankruptcy Code was precipitated by the substantial loss of sales due to the nation's broad economic downturn and the Debtor's inability to purchase new inventory due to a reduction of the Debtor's line of credit. Over the course of this past year, the Debtor engaged in several transactions to enhance liquidity, restructure its operations and effect changes to its equity structure to gain additional capital. However, despite these and other efforts to complete a successful turnaround, the Debtor, like other retailers in this difficult economic environment, continues to experience significant losses

and decreased sales. After considering its alternatives in order to preserve and maximize the value of its assets for the benefit of all stakeholders, the Debtor has decided to institute this chapter 11 proceeding.

14.     The Debtor intends, through this proceeding, to solicit bids to run certain going out of business sales or other high impact sales to orderly liquidate its assets.

## IV. **FIRST DAY MOTIONS AND PROPOSED ORDERS**

15.     To further its above-described objectives, the Debtor has filed its First Day Motions and Proposed Orders, which are essential to maintaining the Debtor's business operations until an orderly sale process can be completed. I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Motions and Proposed Orders is: (a) vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimal interruption or disruption to its business or loss of productivity or value, and (b) constitutes a critical element in achieving a successful sale of the Debtor's assets.

**A.     Motion for the Entry of an Interim Order and Final Order (1) Authorizing Post-Petition Financing, (2) Granting Liens and Super Priority Administrative Expense Status, (3) Scheduling Interim and Final Hearings, and (4) Granting Related Relief Pursuant to Federal Rules of Bankruptcy Procedure 4001 and 9006**

16.     The Debtor has filed its Motion in support of the entry of an interim order and final order (1) approving post-petition financing, (2) granting liens and providing superpriority administrative expense status pursuant to 11 U.S.C. §§363 and 364(c), (3) setting interim and final hearing dates, and (4) granting related relief pursuant to Rules 4001 and 9006 of the Federal Rules of Bankruptcy Procedure. The Debtor intends to

finance its continued operations through a $6.5 million post-petition financing facility (the "DIP Credit Facility") to be provided by Wells Fargo. As discussed above, Wells Fargo also provided the Debtor with its pre-petition financing facility. The reasons supporting the Debtor's need to incur post-petition financing are compelling. The Debtor's pre-petition credit facility required that the Debtor's bank accounts be swept daily such that there was little to no unencumbered cash for the Debtor to fund its post-petition operations. In addition, the Debtor simply cannot generate cash fast enough to cover expenses as they arise and provide adequate protection to Wells Fargo with respect to its pre-petition liens and security interests. Consequently, post-petition financing is critical to fund the Debtor's cash needs during the pendency of this chapter 11 case.

17.     Unless this Court permits the Debtor to incur post-petition financing, the Debtor will be unable to meet its ordinary course business expenditures, i.e. salaries, rents, utilities, which are necessary to conduct its business going forward in this chapter 11 proceeding. Accordingly, to ensure the Debtor has sufficient liquidity going forward, the Debtor is requesting the Court authorize the Debtor to obtain post-petition financing.

**B.      Debtor's Motion for Entry of an Interim Order and Final Order Under Section 105(a), 345(b), 363 and 364 of the Bankruptcy Code Authorizing the (A) Continued Use of the Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, and (C) Continued Honoring Certain Pre-Petition Obligations related to the Use of the Cash Management System**

18.     To efficiently and seamlessly manage its businesses, the Debtor utilizes a centralized cash management system (the "Cash Management System") to collect and transfer funds generated by sales at its retail locations and disburse those funds to satisfy the obligations required to operate its business. The Cash Management System facilitates

the Debtor's cash monitoring, forecasting, and reporting, and enables the Debtor to maintain control over the administration of its bank accounts (the "Bank Accounts") located at certain banks (the "Banks").

19.     By this Motion, the Debtor requests authority to (a) continue using the Debtor's existing Cash Management System, (b) maintain existing bank accounts, and (c) continue honoring certain prepetition obligations related to the use of the Cash Management System. The Debtor requests that the Court grant such relief on an interim basis as of the Petition Date and schedule a hearing to consider this Motion on a final basis.

20.     The Debtor generates and receives funds primarily from two sources: (i) cash or check sales of merchandise at its retail locations, and (ii) the collection of credit card receivables from credit card sales.    As discussed above, the Debtor operates forty-nine (49) retail store locations. The Debtor accepts payment by cash, check or credit card in each of its retail locations. On a daily basis, (i) the proceeds of its sales at each of its stores as well as its accounts receivables are deposited into the bank accounts with instructions to wire all such deposits to the Debtor's blocked account at Wells Fargo (the "Blocked Account"); (ii) each of the Debtor's credit card processors have entered into a written agreement with the Debtor and Wells Fargo whereby the Debtor irrevocably instructed each credit card processor to wire all proceeds to the Blocked Account; and (iii) the balances in the Blocked Account are applied daily to reduce the Debtor's revolving loan balance due under the Prepetition Revolver Facility.

21.     Prior to the Petition Date, each day, in accordance with the terms of the Prepetition Credit Agreement, the Debtor requested an advance from Wells Fargo bank in

an amount sufficient to cover the disbursements it intended to make that day. Subject to availability under the borrowing base and satisfaction of other conditions under the Prepetition Credit Agreement, Wells Fargo would make a loan to the Debtor in such amount and wire the funds to its main operating account (the "Main Operating Account") at Wells Fargo Bank. Amounts in the Main Operating Account are used to fund the Debtor's business operations.

22.     The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, inter alia, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's business.

23.     The Debtor will continue to maintain all receipts and disbursements and records of all transfers within the Cash Management System. In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained. As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System and to distinguish between pre- and postpetition payments.

24.     The Debtor will maintain its books and records relating to the Cash Management System to the same extent the books and records were maintained before the Petition Date. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate and all parties in

interest. Therefore, the Debtor seeks authority to maintain and use its Cash Management System during this Chapter 11 Case.

## C. Application for an Order Granting the Debtor Additional Time within which to File its Schedules and Statement of Financial Affairs

25. The Debtor has filed its Application for an Order Granting the Debtor Additional Time within which to file its Schedules and Statement of Financial Affairs. Since the Petition Date, Mr. Brian Lipman, the Debtor's Chief Executive Officer, and Kyong H. Yun, the Debtor's Chief Financial Officer, have been attending to the transition into Chapter 11 and also overseeing the day-to-day business operations of the Debtor's forty-nine stores. Accordingly, the same has distracted the Debtor from being in a position to finalize the Debtor's schedules. The Debtor is currently attempting to bring its books and records up to date in order to be able to complete all necessary information for the Schedules. Therefore, the Debtor requests a brief extension of time through and including June 22, 2009 within which to prepare its Schedules and Statement of Financial Affairs.

## D. Debtor's Motion for Order Under Bankruptcy Code Sections 105(a), 507(a)(7), 553, 1107(a) and 1108 Authorizing Continuation of Certain Customer Practices

26. The Debtor has filed its motion for the entry of an order, under sections 105(a), 507(a)(7), 553, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtor to continue (a) to honor all Gift Cards issued prior to the Petition Date; (b) provide Refunds to customers with respect to products purchased prior to the Petition Date in the ordinary course of business; (c) to deliver "made to measure" garments previously paid for but not yet delivered to its

customers; and (d) to honor all such other similar policies, programs and practices of the Debtor in the ordinary course of business.

27. Prior to the Petition Date, in the ordinary course of its retail stores, the Debtor provided its customers with certain benefits in the form of the Customer Satisfaction Programs and, as a result thereof, received from customers, without limitation, payments for gift cards that customers had not yet redeemed for goods or services, payments in full for "made to measure" suits, refunds, returns, exchanges, adjustments (including adjustments to billing) and other credit balances relating to goods sold or services rendered to customers in the ordinary course of business prior to the Petition Date (collectively, the "Customer Obligations").

28. The viability of the Debtor's business is dependent upon customer loyalty. In the Debtor's business judgment, the uninterrupted maintenance of its Customer Satisfaction Programs is essential to maintaining loyalty and avoiding harm to consumers. Sales have been on a downward trend during fiscal year 2009 and beyond and the Debtor does not want to accelerate that trend by discontinuing or not honoring the Customer Satisfaction Programs. Any disruption and adverse publicity that would necessarily result from the failure to meet customer obligations or from discontinuing its Customer Satisfaction Programs would threaten the Debtor's customer base.

29. Nothing herein shall be deemed an assumption or adoption of any policy, program, practice, contract or agreement or shall otherwise affect the Debtor's rights under Bankruptcy Code section 365 to assume or reject any executory contract or unexpired lease. Based on the foregoing, the Debtor submits that entry of an order authorizing them to honor the Customer Obligations and to continue and maintain post-

petition the Customer Satisfaction Programs is necessary and appropriate.

30.     The foregoing demonstrates the substantial benefits that will inure to the Debtor's estate, creditors and interest holders as a result of it maintaining and continuing the Customer Satisfaction Programs and honoring its Customer Obligations. The Debtor, however, does not at this time request blanket authorization to assume as executory contracts all prepetition obligations to customers. Rather, the Debtor simply requests authorization to continue the Customer Satisfaction Programs as the Debtor believes, in the exercise of its business judgment, are necessary and in their best interests and in the best interests of its estate, creditors and interest holders.

31.     Presently, the Debtor estimates that the amounts of outstanding obligations with respect to gift certificates is approximately $162,000.00. Additionally, the Debtor estimates approximately $240,000.00 a month for returns and allowances. Finally, with respect to "made to measure" garments, the Debtor estimates that it will need to pay $55,000.00 to deliver the post-petition "made to measure" garments to customers which will reduce consumer claims by $140,000.00.

32.     The Debtor requests that the order proposed be entered on an interim basis with a final hearing to be scheduled at a later date if objections to the Motion are received.

33.     The viability of the Debtor's business, and the ultimate sale of its business, are totally dependent upon the patronage and loyalty of its customers. In this regard, the Debtor's Customer Satisfaction Programs are critical, and any delay in honoring the Debtor's obligations thereunder will harm and impair customer relations.

34.     Accordingly the Debtor seeks Court authority to continue the Customer

Satisfaction Programs, and in particular, the authority to honor prepetition claims arising therefrom, consistent with the amounts set forth in the Debtor's budget filed with this Court.

**E.    Motion for an Order Pursuant to Sections 105(a), 363, 506(a), 507(a)(8), and 541 of the Bankruptcy Code Authorizing, But Not Directing, the Debtor to Pay Pre-Petition Taxes and Related Obligations**

35.    The Debtor has filed its Motion for entry of an order, pursuant to sections 105(a), 363, 506(a), 507(a)(8), and 541 of chapter 11 of title 11 of the United States Code (the `Bankruptcy Code") (i) authorizing, but not directing, the Debtor to pay prepetition sales, use, trust fund, property and other taxes and related obligations as such obligations come due; and (ii) authorizing the Debtor's banks to receive, process, honor and pay all checks, drafts, wires or automated clearing house transfers, drawn or issued on the Debtor's bank accounts in respect of such taxes.

36.    In the normal course of business, the Debtor is required to collect sales taxes (the "Sales Taxes") from purchasers of its products on a per sale basis and periodically remit the Sales Taxes to the applicable taxing authorities. Typically, Sales Taxes accrue as products are sold, and such taxes are calculated as a statutory percentage of the sale price. The process by which the Debtor remits the Sales Taxes varies, depending on the nature of the tax at issue and the taxing authority which is to be paid. Sales Taxes are remitted to the relevant taxing authorities either on the basis of estimated sales tax collections for the coming period or on the basis of sales tax actually collected from customers, in each case depending on the method required by the relevant taxing authority. Similarly, states differ with regard to the frequency of payments. With respect to those jurisdictions that require the Debtor to remit estimated Sales Taxes, the

applicable taxing authority subsequently reconciles payments to determine any payment deficiency or surplus for the period. A refund or payment is then either received or made.

37.    The Debtor also incurs use taxes (the "Use Taxes") in connection with its purchase of certain tangible personal property or services from vendors that have no nexus to the resident state of the particular Debtor purchasing the property or services. Such vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations. Nevertheless, under the various state laws governing Use Taxes, the purchasers, in this case the Debtor is obligated to self-assess and pay the Use Taxes, when applicable, to the state in which the purchasing Debtor operates.

38.    Although the Debtor believes that it is current on all of its taxes that have become due as of the Petition Date, because many of such taxes are paid on a periodic basis (and in arrears), there is, in many instances, a lag between the time when the Debtor incurs an obligation to pay the taxes and the date such taxes become due and payable. Various taxing authorities may therefore have claims against the Debtor for taxes that have accrued but remain unpaid as of the Petition Date, and for certain other taxes that will come due during the pendency of these cases. Accordingly, by this Motion the Debtor requests the authority, in its discretion, to pay the relevant taxing authorities any taxes that have accrued, but were not yet due and owing or were not paid in full as of the Petition Date and any prepetition taxes that arose prior to the Petition Date that become due and owing during the pendency of these cases in the ordinary course of business.

39.    The Debtor estimates that, as of the Petition Date, its accrued and unpaid liabilities for taxes are approximately $162,551.53. By this Motion, the Debtor seeks to pay such taxes up to the amounts specified as an estimate in this paragraph plus

additional amounts, if necessary, beyond the foregoing estimate, when such taxes become due and owing to any relevant Taxing Authority. Although the Debtor believes its estimate of its tax liabilities set forth in this Motion has been accurately and completely prepared, permitting total payments on account of such prepetition taxes will permit the Debtor to pay most or all additional tax liabilities that may be identified while limiting or eliminating the need to secure further Court approval for payment of such amounts.

40. To implement the relief requested herein, the Debtor further requests that the order approving this Motion authorize banks and other financial institutions to honor and process wires, ACH Transfers, deposits, or checks issued by the Debtor whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**F. Application for Entry of an Order Authorizing Payment of Certain Pre-Petition Salaries, Wages, Employee Benefits, Taxes and Expenses**

41. The Debtor seeks the entry of an order pursuant to §§ 105(a) and 507(a)(4) and (5) of the Bankruptcy Code, for authority to satisfy the Debtor's Pre-Petition payroll obligations to certain of the employees, which include full-time employees, part-time employees and independent contractors, (the "Employees") of the Debtor. These pre-petition obligations (the "Pre-petition Wage Obligations") may include but not limited to: amounts owed to the Employees for salaries, wages, vacation pay, holiday pay, severance pay, commissions, employee benefits, employee medical benefits, dental benefits, Vision benefits, COBRA benefits, broker insurance management fees, insurance, federal, state and local payroll related taxes, deductions and withholdings, payroll deductions in respect of various benefits, and reimbursable business expenses which may include expenses incurred by Employees but not yet paid through the Petition Date ("Employee

Compensation").

42. Pursuant to this Application, the Debtor is seeking that this Court authorize payment in the sum of approximately $131,000.00 for salaried employees (the "Pre-Petition Salaried Employee Obligation Sum"). The amount due and owing with respect to the Pre-Petition Salaried Employee Obligation Sum is for the pre-petition period of March 28, 2009 through May 4, 2009.

43. Additionally, pursuant to this Application, the Debtor is seeking that this Court authorize the payment in the sum of approximately $130,000.00 for commissioned and hourly employees (the "Pre-Petition Commissioned and Hourly Employee Obligation Sum"). The amount due and owing with respect to the Pre-Petition Commissioned Employee Obligation Sum is for the pre-petition period of April 24' 2009 through May 4, 2009.

44. The Debtor provides a medical, dental and a vision plan for its full time Employees (collectively the "Medical Plans"). The Medical Plans are self insured plans that provide health care coverage to approximately 114 Employees. The Medical Plan costs the Debtor approximately on average $69,000.00 per month in gross claims and approximately $12,000.00 per month in administrative fees to the third party administrator. Prior to the Petition Date, the Debtor incurred certain administrative obligations to the third party administrator, which have not yet been paid in the amount of $11,779.16. In addition, prior to the Petition Date, certain Employees filed claims under the Medical Plans, which have not yet been paid. The Debtor maintains excess insurance through HHC Life to cover medical expenses under the Debtor's Medical Plans that exceed $125,000.00 per year per Employee (the "Stop Loss Insurance"). The

Debtor pays an average monthly premium of $6,326.00 per month for the Stop Loss Insurance.

45. By this Motion, the Debtor also seeks authority, to be exercised in its sole discretion, and consistent with the amounts reflected in the budget, to (a) continue the Medical Plans in the ordinary cause of business; (b) continue making the above-described contributions to such benefit programs; (c) pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid as of the Petition Date; and (d) maintain the Stop Loss Insurance.

46. The aggregate of the amount due and owing to any single employee does not include any wages earned more than 180 days prior to the Petition Date. Moreover, the Debtor, pursuant to this Application, is not seeking the payment of Pre-Petition Wage Obligations owed to insiders of the Debtor. The aforementioned relief will enable the Debtor to avoid any disruption to its operations. The Debtor fears that if the Employees are not paid all Pre-Petition Wage Obligations, they will quit, or no longer work for the Debtor, and leave the Debtor in a position where they will have to replace numerous employees instantaneously. Further, critical employees may immediately stop working for the Debtor. The costs and expenses associated with locating and training new employees would likely exceed the costs of honoring pre-petition compensation at this time. The Debtor believes that the "doctrine of necessity" amply justifies the payment of pre-petition wages. The Debtor cannot be left in a position where Employees do not show up for work because they are not paid. The Debtor's ability to maintain their business operations necessitates the relief sought herein.

47.     Furthermore, absent the relief requested herein, the Employees and their families will suffer undue hardship because their wages and benefits are absolutely necessary to enable them to meet their personal financial obligations and maintain and support their families and dependents. In today's economic climate non-payment of the Employee can have a devastating affect on the Employees and their families.

**G.     Debtor's Motion Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for Entry of an Interim Order and Final Order (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services; (ii) Deeming Utility Providers Adequately Assured of Future Performance; and (iii) Establishing Procedures for Resolving Additional Adequate Assurance Requests**

48.     The Debtor has filed this Motion for entry of an interim order (the "Interim Order") and a final order (the "Final Order"), pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting utility providers from altering, refusing or discontinuing services to the Debtor, (ii) deeming the utility providers adequately assured of future performance, and (iii) establishing procedures for resolving requests for additional adequate assurance of future payment to the utility providers.

48.     By this Motion, the Debtor seeks to preserve the protections that the Utility Providers have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services. In particular, the Debtor requests approval of certain procedures that balance the protections afforded the Utility Providers under section 366 of the Bankruptcy Code which the Debtor needs for continuous and uninterrupted Utility Services.

50.     The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers in a timely manner, and based on the post-petition financing facility to

be provided by the Debtor's existing lender, believes that it has sufficient funds available to do so. Additionally, the Debtor proposes to provide a deposit equal to two (2) weeks of utility service, calculated as a historical average over the past twelve (12) months, to any Utility Provider that requests such a deposit in writing (the "Adequate Assurance Deposit"), provided that (i) such Utility Provider does not already hold a deposit equal to or greater than two (2) weeks of utility services[2] and (ii) such Utility Provider is not currently paid in advance for its services. As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Provider shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of future payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of the Debtor's chapter 11 case except upon a showing of changed circumstances and further order of the Court.

51.    The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient "adequate assurance of payment." Nonetheless, the Debtor anticipates that certain Utility Providers may not find the Proposed Adequate Assurance "satisfactory" and, thus, may request additional adequate assurance of payment pursuant to section 366(c)(2) of the Bankruptcy Code.

52.    Debtor further requests that any Utility Provider that does not serve an

---

[2]        Where a Utility Provider holds a deposit equal to less than two (2) weeks of Utility Services (the "Existing Deposit"), the Debtor proposes to provide a deposit which, when added to the Utility Provider's Existing Deposit, equals two (2) weeks of Utility Services.

Adequate Assurance Request by the Adequate Assurance Request Deadline or otherwise file an objection to the Motion shall be deemed to have received adequate assurance of payment as required by section 366 of the Bankruptcy Code and shall be prohibited from discontinuing, altering, or refusing to provide Utility Services to the Debtor.

53.     Upon the earlier of (i) the effective date of the Debtor's chapter 11 plan, or (ii) termination of Utility Services from the Utility Provider, the Utility Provider shall either (a) immediately return any Adequate Assurance Deposit or any other additional adequate assurance deposit (the "Additional Adequate Assurance Deposit") to the Debtor at the following address: Bachrach Acquisition, LLC, 1430 Broadway, Suite 308, New York, New York, Attn: Brian Lipman, or (b) apply any Adequate Assurance Deposit or Additional Adequate Assurance Deposit to any outstanding or future invoice for Utility Services provided to the Debtor.

54.     In the event that any Utility Provider, including a subsequently added Utility Provider, files and/or serves an Adequate Assurance Request after the Adequate Assurance Request Deadline, such request shall be treated as a request pursuant to section 366(b) of the Bankruptcy Code and shall be granted, if at all, only after the Utility Provider making such request schedules such request for hearing, on notice, in accordance with the provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

55.     All Utility Providers, including subsequently added Utility Providers, shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor pending a Final Order of this Court, in accordance with section 366(a) of the Bankruptcy Code. See 11 U.S.C. § 366(a).

56. The Debtor maintains that the relief requested herein strikes a fair balance between the rights of Utility Providers and the rights of the Debtor under the Bankruptcy Code and the need for the Debtor to continue to receive the Utility Services upon which its business depends. The Debtor do not believe that the Utility Providers will be prejudiced by the Proposed Adequate Assurance and the approval of the Adequate Assurance Procedures.

## V. **INFORMATION REQUIRED BY LOCAL RULE 1007-2**

57. Local Rule 1007-2 requires certain information related to the Debtor, which is set forth below. The information requested in Local Rule 1007-2(a)(1) is set forth in Parts II and III above. In response to the information requested in Local Rule 1007-2(a)(3), to the best of my knowledge, no committee has been organized prior to the Petition Date. Pursuant to Local Rule 1007-2(a)(4), **Schedule "1"** hereto provides a list of the Debtor's twenty (20) largest unsecured creditors in this case.

58. Pursuant to Local Rule 1007-2(a)(5), **Schedule "2"** provides a list of the Debtor's five (5) largest secured creditors including the amounts of the claim, a brief description and an estimate of the value securing the claim, and indication of whether or not the claim or lien is disputed.

59. Pursuant to Local Rule 1007-2(a)(6), **Schedule "3"** provides a summary of the Debtor's assets and liabilities.

60. In response to the information requested in Local Rule 1007-2(a)(7), the Debtor does not have any publicly held stock, debentures or other securities.

61. Pursuant to Local Rule 1007-2(a)(8), none of the of the Debtor's property is currently in the possession or custody of any custodian, public officer, mortgagee,

pledge, assignee of rents, or secured creditor, or agent for any such entity.

62.  Pursuant to Local Rule 1007-2(a)(9), the Debtor does not own any real property. Attached hereto as **Schedule "4"** is a list of the premises the Debtor leases and the monthly rents with respect to each lease.

63.  Pursuant to Local Rule 1007-2(a)(10), The Debtor's office equipment, computer equipment and warehouse racking system are located at 1430 Broadway, Suite 308, New York, New York and 1 Bachrach Court, Decatur, IL. The Debtor's inventory is located at the store locations described in **Schedule "4"** and 1 Bachrach Court, Decatur, IL. Additionally, the Debtor's books and records are located at 1430 Broadway, Suite 308, New York, New York and 1 Bachrach Court, Decatur, IL. Further, the Debtor has fifty thousand dollars worth of fabrics in Italy. The Debtor does not have any other assets outside of the United States.

64.  Pursuant to Local Rule 1007-2(a)(10), **Schedule "5"** provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property.

65.  Pursuant to Local Rule 1007-2(a)(12), the following individuals comprise the Debtor's existing senior management: Brian Lipman, Chief Executive Officer, Hyung K. Kim, Chief Strategic Officer and Kyong H. Yun, Chief Financial Officer.

66.  Pursuant to Local Rule 1007-2(b)(1)-(2)(A), it is estimated that the amount of bi-weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following the filing of the Chapter 11 petition is $650,000.00. Additionally, the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the Chapter 11 petition to any officers

and directors, stockholders, or business consultants is $37,000.00.

      67.    Pursuant to Local Rule 1007-2(b)(3), **Schedule "6"** is a copy of the Debtor's cash flow statement.

**[INTENTIONALLY LEFT BLANK]**

## CONCLUSION

I hereby declare under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all the relief requested in the First Day Motions, together with such other and further relief is just.

Dated: May 6, 2009
      New York, New York

BACHRACH ACQUISITION, LLC

Brian Lipman, CEO

# SCHEDULE 1

# United States Bankruptcy Court
## Southern District of New York

In re   Bachrach Acquisition, LLC

Debtor(s)

Case No.   09-12918

Chapter   11

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>Name of creditor and complete mailing address including zip code | (2)<br><br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br><br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br><br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Simon Property Group<br>225 West Washington Street<br>Indianapolis, IN 46204 | Simon Property Group<br>225 West Washington Street<br>Indianapolis, IN 46204 | | | 1,246,477.00 |
| M&H International<br>1333 Broadway<br>Suite 1112<br>New York, NY 10018 | M&H International<br>1333 Broadway<br>Suite 1112<br>New York, NY 10018 | | | 827,894.00 |
| Vestige Design Int'l, Inc.<br>Attn: Alan Lim<br>209 W. 38th St., Suite 411<br>New York, NY 10018 | Vestige Design Int'l, Inc.<br>Attn: Alan Lim<br>209 W. 38th St., Suite 411<br>New York, NY 10018 | | | 782,643.00 |
| General Growth Properties<br>110 N. Wacker Dr.<br>Chicago, IL 60606 | General Growth Properties<br>110 N. Wacker Dr.<br>Chicago, IL 60606 | | | 671,674.00 |
| William Gilbey, Inc.<br>1410 Broadway<br>14th Fl.<br>New York, NY 10018 | William Gilbey, Inc.<br>1410 Broadway<br>14th Fl.<br>New York, NY 10018 | | | 661,257.00 |
| CIT Group/Commercial Services<br>11 West 42nd Street, 12th Fl<br>New York, NY 10036 | CIT Group/Commercial Services<br>11 West 42nd Street, 12th Fl<br>New York, NY 10036 | | | 462,056.00 |
| Westfield - Hawthorn, L.P.<br>P.O. Box 96184<br>Chicago, IL 60693 | Westfield - Hawthorn, L.P.<br>P.O. Box 96184<br>Chicago, IL 60693 | | | 441,103.00 |
| Taubman<br>200 E. Long Lake Road<br>Suite 300<br>Bloomfield Hills, MI 48303 | Taubman<br>200 E. Long Lake Road<br>Suite 300<br>Bloomfield Hills, MI 48303 | | | 380,099.00 |
| Race Monsieur, Inc.<br>85-36 212th Street<br>Queens Village, NY 11427 | Race Monsieur, Inc.<br>85-36 212th Street<br>Queens Village, NY 11427 | | | 365,209.00 |
| Macerich Partnership<br>Chesterfield Town Center<br>Dept. 2596-3030<br>Los Angeles, CA 90084-2596 | Macerich Partnership<br>Chesterfield Town Center<br>Dept. 2596-3030<br>Los Angeles, CA 90084-2596 | | | 324,711.00 |

In re  Bachrach Acquisition, LLC          Case No.    09-12918
_____
Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
(Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| Zakaryah Inc<br>3757 Overlnd Ave.<br>Los Angeles, CA 90034 | Zakaryah Inc<br>3757 Overlnd Ave.<br>Los Angeles, CA 90034 | | | 318,147.00 |
| SG Apparel, Inc.<br>1270 Broadway, Penthouse<br>New York, NY 10001 | SG Apparel, Inc.<br>1270 Broadway, Penthouse<br>New York, NY 10001 | | | 300,000.00 |
| Braemore Neckwear Co.<br>12 Densley Ave.<br>Toronto, Ontario, M6M 2R1<br>CANADA | Braemore Neckwear Co.<br>12 Densley Ave.<br>Toronto, Ontario, M6M 2R1<br>CANADA | | | 272,833.00 |
| Pyramid Walden Company, L.P.<br>M&T Bank<br>P.O. Box 8000, Dept. 496<br>Buffalo, NY 14267 | Pyramid Walden Company, L.P.<br>M&T Bank<br>P.O. Box 8000, Dept. 496<br>Buffalo, NY 14267 | | | 227,206.00 |
| Quad/Graphics Inc.<br>P.O. Box 930505<br>Atlanta, GA 31193 | Quad/Graphics Inc.<br>P.O. Box 930505<br>Atlanta, GA 31193 | | | 191,734.00 |
| Preit<br>200 South Broad Street<br>Philadelphia, PA 19102 | Preit<br>200 South Broad Street<br>Philadelphia, PA 19102 | | | 190,577.00 |
| Gordon Mitchell<br>155 Drumlin Circle, Ste 4<br>Concord, Ontario, L4K 3E7<br>CANADA | Gordon Mitchell<br>155 Drumlin Circle, Ste 4<br>Concord, Ontario, L4K 3E7<br>CANADA | | | 188,105.00 |
| North Park<br>8080 North Central Expressway<br>Suite 1100<br>Dallas, TX 75206 | North Park<br>8080 North Central Expressway<br>Suite 1100<br>Dallas, TX 75206 | | | 180,705.00 |
| CBL/Properties<br>2030 Hamilton Pl Blvd<br>Suite 500<br>Chattanooga, TN 37421 | CBL/Properties<br>2030 Hamilton Pl Blvd<br>Suite 500<br>Chattanooga, TN 37421 | | | 178,134.00 |
| Fed Ex Corporation<br>1000 Omega Drive<br>Suite 1470<br>Pittsburgh, PA 15205 | Fed Ex Corporation<br>1000 Omega Drive<br>Suite 1470<br>Pittsburgh, PA 15205 | | | 173,225.98 |

# SCHEDULE 2

### LIST OF CREDITORS HOLDING 5 LARGEST SECURED CLAIMS

| NAME OF CREDITORS AND COMPLETE MAILING ADDRESS (INCLUDING ZIP CODE) | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS (INCLUDING ZIP CODE) OF EMPLOYEE, AGENT, OR DEPARTMENT (IF DIFFERENT FROM MAILING ADDRESS) OF CREDITOR FAMILIAR WITH CLAIM | AMOUNT OF CLAIM | DESCRIPTION AND EST. VALUE OF COLLATERAL SECURING CLAIM |
|---|---|---|---|
| Wells Fargo Bank, National Association, Acting through Wells Fargo Business Credit Operating Division 119 West 40th Street New York, NY 10018 | | $6,202,302.30 | All of the Debtor's assets |
| Bachrach Investors LLC c/o Ed Lifshitz 6 East 43rd Street 24th Floor New York, NY 10017 | | $220,000.00 | All of the Debtor's assets |
| RAI Credit, LLC Accucredit Associates LLC 21 Main Street, Suite 352 Hackensack, NJ 07601 | | $0.00 | Unknown |
| IBM Credit LLC 1 North Castle Drive Armonk, NY 10504 | | $359,000.00 | Equipment |
| Weatherproof Garment Company, a Division of David Peyser Sportswear, Inc. 90 Spence Street, P.O. Box 9171 Bay Shore, NY 11706 | | $692,236.74 | All of the Debtor's assets |

# **SCHEDULE 3**

|  | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|

**ASSETS**

**CURRENT ASSETS**

| | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|
| CASH - BANKS | $453,428.50 | $325,286.75 | $128,141.75 |
| PETTY CASH - CORPORATE | 2,000.00 | 2,000.00 | |
| PETTY CASH - STORES | 43,383.52 | 39,558.60 | 3,835.02 |
| ACCOUNTS RECEIVABLE | 11,117.41 | 652,062.93 | (640,945.52) |
| RESERVE FOR BAD DEBTS | (25,000.00) | (25,000.00) | |
| DUE FROM MEMBERS | | 2,500.01 | (2,500.01) |
| DUE FROM RAI | 57,035.00 | | 57,035.00 |
| DUE FROM BACHRACH CLOTH INC | | (23,465.26) | 23,465.26 |
| INVENTORY | 10,145,199.38 | 15,363,050.15 | (5,217,850.77) |
| C.M.T. INVENTORY IN PROCESS | 337,155.88 | 337,155.88 | |
| IMPORT INVENTORY IN PROCESS | 808,279.44 | 569,251.07 | 239,028.37 |
| PREPAID CATALOG EXPENSE | 1,661,764.71 | 1,395,781.04 | 265,983.67 |
| LEASEHOLD INTEREST S&B | 15,924.36 | 26,540.52 | (10,616.16) |
| PREPAID RENT | 17,500.00 | 17,500.00 | |
| SECURITY DEPOSITS | 873,265.30 | 878,883.06 | (5,697.76) |
| EMPLOYEE ADVANCES | (17,534.91) | 227,571.32 | (245,106.23) |
| OTHER ASSETS | 185,452.45 | 124,841.73 | 60,620.72 |
| PREPAID EXPENSES | 215,038.34 | 71,472.03 | 143,566.31 |
| TOTAL CURRENT ASSETS | 14,804,049.46 | 19,984,988.83 | (5,180,939.35) |

**FIXED ASSETS**

| | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|
| VEHICLES | 16,500.00 | 17,500.00 | (1,000.00) |
| COMPUTER EQUIPMENT | 609,806.26 | 508,421.68 | 101,385.60 |
| FIXTURES | 1,765,630.28 | 1,379,663.10 | 386,377.18 |
| FURNITURE & FIXTURES - NEW BUILDING | 25,000.00 | 25,000.00 | |
| FURNITURE & FIXTURES - NEW YORK OFFICE | 70,000.00 | 70,000.00 | |
| WAREHOUSE - DC EQUIPMENT | 1,691,148.12 | 1,690,446.34 | 701.78 |
| LEASEHOLD IMPROVEMENTS | 8,847,959.37 | 6,470,927.60 | 2,377,031.71 |
| CONSTRUCTION IN PROGRESS | 209,523.47 | 355,356.76 | (146,833.29) |
| ACCUMULATED DEPRECIATION | (4,592,571.04) | (2,382,982.01) | (2,209,879.03) |
| TOTAL FIXED ASSETS | 8,642,326.46 | 8,134,343.53 | 507,984.95 |

| TOTAL ASSETS | 23,446,377.95 | 28,119,332.36 | (4,672,954.40) |
|---|---|---|---|

|  | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|

**LIABILITIES**

**CURRENT LIABILITIES**

| | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|
| ACCOUNTS PAYABLE | $11,437,362.61 | $8,465,342.15 | $2,972,020.46 |
| OTHER ACCOUNTS PAYABLE | 577,288.44 | 597,810.90 | (20,611.46) |
| RENT PAYABLE | 630,188.97 | | 630,188.97 |
| GIFT CERTIFICATES | 162,871.74 | 312,000.67 | (149,128.93) |
| CUSTOMER REFUNDS | | | |
| CUSTOMER DEPOSITS - CATALOG | (3,081.32) | (164.43) | (3,026.89) |
| SALES TAX PAYABLE | 100,798.11 | 202,120.26 | (101,324.15) |
| ACCRUED GENERAL TAXES | (1,045.14) | (1,045.14) | |
| NOTE PAYABLE - WELLS FARGO | 5,825,481.26 | 10,276,332.66 | (4,449,851.40) |
| INTEREST PAYABLE | 50,535.65 | 94,694.45 | (44,158.80) |
| ACCRUED PAYROLL | 248,515.79 | 497,200.90 | (248,685.11) |
| UNCLAIMED PROPERTY | | | |
| PAYROLL CLEARING | 66,487.21 | | 66,487.21 |
| 401(K) WITHHOLDING | 1,026.40 | 766.18 | 260.22 |
| GARNISHMENTS | 15.00 | 15.00 | |
| ACCRUED PAYROLL TAX WITHHOLDINGS | 3,660.01 | 3,660.01 | |
| DEFERRED TENANT ALLOWANCE | 3,426,997.56 | 2,145,425.61 | 1,281,571.97 |
| STRAIGHT LINE RENT | (1,101.01) | | (1,101.01) |
| INCOME TAXES PAYABLE | 3,225.00 | 6,263.00 | (3,038.00) |
| TOTAL CURRENT LIABILITIES | 22,429,835.32 | 22,600,532.24 | (170,706.92) |

**LONG TERM LIABILITIES**

| | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|
| NOTES PAYABLE TO MEMBERS | 1,000,000.00 | 3,500,000.00 | (2,500,000.00) |
| DEFERRED TENANT ALLOWANCE | | | |
| TOTAL LONG TERM LIABILITIES | 1,000,000.00 | 3,500,000.00 | (2,500,000.00) |

| TOTAL LIABILITIES | 23,429,835.32 | 26,100,532.24 | (2,670,706.92) |
|---|---|---|---|

**MEMBER EQUITY**

| | March 2009 | March 2008 | VARIANCE |
|---|---|---|---|
| MEMBER CONTRIBUTIONS | 18,249,998.00 | 9,249,998.00 | 9,000,000.00 |
| RETAINED EARNINGS | (15,847,395.48) | (5,270,854.65) | (10,576,610.83) |
| NET INCOME (LOSS) | (2,386,189.88) | (1,960,643.23) | (425,546.65) |
| TOTAL MEMBER EQUITY | 16,542.64 | 2,018,700.12 | (2,002,157.48) |

| TOTAL LIABILITIES & EQUITY | 23,446,377.95 | 28,119,332.36 | (4,672,954.40) |
|---|---|---|---|

# SCHEDULE 4

| **Leases:** | **Monthly Rents:** |
|---|---|
| 1430 Broadway, 3rd Floor<br>Suite 308<br>New York, NY 10018 | $18,698.73 |
| Decatur Distribution Center<br>One Bachrach Court<br>Decatur, IL 62526 | $14,166.67 |
| S&B Men's Superstore<br>1584 State Route 59<br>Naperville, IL 60564 | 10% of Sales |
| Cumberland Mall<br>1000 Cumberland Parkway, Suite 1136<br>Atlanta, GA 30339 | $18,939.68 |
| Perimeter Mall<br>4400 Ashford Dunwoody Rd., Suite 1235<br>Atlanta, GA 30346 | $28,508.96 |
| The Mall at Stonecrest<br>2929 Turner Hill Road, Space 2750<br>Lithonia, GA 30038 | $19,750.25 |
| Bachrach Store<br>824 W. North Ave.<br>Chicago, IL 60642 | 15% of Sales |
| Fox Valley Center<br>2416 Fox Valley Center<br>Aurora, IL 60504 | $21,921.59 |
| Harlem-Irving Plaza<br>4178 North Harlem Ave.<br>Norridge, IL 60634 | 10% of Sales |
| Hawthorne Center<br>113 Hawthorne Center<br>Vernon Hills, IL 60061 | $22,135.20 |
| North Riverside Mall | 10% of Sales |

7501 W. Cermak Rd., Space E9
North Riverside, IL 60546

Orland Square Shopping Center                          $30,259.01
644 Orland Square, F-11
Orland Park, IL 60462

Woodfield Mall                                         $58,184.88
N-106 Woodfield Mall
Schaumberg, IL 60173

Glen Ellyn Bachrach Outlet                            $12,498.00
695 E. Roosevelt Rd.
Glen Ellyn, IL 60137

East Mall Shopping Center                             $10,278.95
1615 E. Empire
Bloomington, IL 61701

Market Place Mall                                     $19,177.68
2000 N. Neil Street
Champaign, IL 61820

Decatur Crossing                                       $4,607.33
4206 N. Prospect
Unit 103
Decatur, IL 62526

Eastland Mall                                         $17,933.08
800 N. Green River Rd.
Evansville, IN 47715

The Fashion Mall at Keystone Crossing                 $22,813.99
8702 Keystone Crossing, Space #104
Indianapolis, IN 46240

Southlake Mall                                        $22,174.53
2046 Westfield Shoppingtown Southlake
Merrillville, IN 46410

Castleton Square                                      $17,402.02
6020 East 82nd Street- Space 1501
Indianapolis, IN 46250

| | |
|---|---|
| Hamilton Towne Center<br>13170 Harrell Parkway, Space A15<br>Nobleville, IN 46060 | $20,122.90 |
| Oak Park Mall<br>11463 West 95th Street, Suite 57<br>Overland Park, KS 66214 | $5,074.07 |
| Westfiled Shoppingtown Montgomery Mall<br>7101 Democracy Blvd. - Space 1136<br>Bethesda, MD 20817-1018 | $32,077.40 |
| Briarwood Mall<br>652 Briarwood Circle<br>Ann Arbor, MI 48108 | $15,233.21 |
| Lakeside Mall<br>14600 Lakeside Circle – Unit 1376<br>Sterling Heights, MI 48313 | $30328.91 |
| The Somerset Collection North<br>2800 W. Big Beaver North, Space S-208<br>Troy, MI 48084 | $37,006.10 |
| Twelve Oaks Mall<br>27228 Novi Road<br>Novi, MI 48377 | $30,005.96 |
| Woodland Mall<br>3159 28th St. S. E., Space A-7<br>Grand Rapids, MI 49512 | $16,538.26 |
| Meadows at Lake St. Louis<br>10 Meadows Circle Drive, Suite 104<br>Lake St. Louis, MO 63367 | 10% of Sales |
| Newport Centre Mall<br>30 Mall Drive West<br>Space B14A<br>Jersey City, NJ 07310 | $31,149.15 |
| Roosevelt Field Mall<br>630 Old Country Road<br>Space 1108B<br>Garden City, New York 11530 | $45,078.18 |

| | |
|---|---|
| Crossgates Mall<br>1 Crossgates Mall Road<br>Space D206<br>Albany, NY 12203 | $24,993.98 |
| Walden Galleria- Space G101<br>One Walden Galleria<br>Buffalo, NY 14225 | $22,034.89 |
| S&B<br>A Bachrach Outlet<br>120 Milbar Road<br>East Farmingdale, NY 11735 | $15,415.03 |
| S&B<br>A Bachrach Outlet<br>69-65 Yellowstone Blvd<br>Forest Hills, NY 11375 | $5,703.73 |
| Penn Square Mall<br>1901 N.W. Expressway, #1037<br>Oklahoma City, OK 73118 | $19,503.91 |
| Monroeville Mall<br>277 Monroeville Mall<br>Monroeville, PA 15146 | $21,680.38 |
| The Court of King of Prussia<br>160 N. Gulph Road, Suite 1351<br>King of Prussia, PA 19406 | $25,439.62 |
| Willow Grove Park Mall<br>2500 Moreland Road<br>Space 2107<br>Willow Grove, PA 19090 | $20,466.00 |
| The Mall at Green Hills<br>2126 Abbott Martin Rd.<br>Space 157<br>Nashville, TN 37215 | $22,454.04 |

La Plaza Mall  
2200 South 10th Street/ Suite P01  
McAllen, TX 78503  

$14,663.12

Houston Galleria  
5015 Westheimer, Suite 3345  
Houston, TX 77056  

$33,427.11

Northpark Center  
717 Northpark Center  
Dallas, TX 75225  

$ 41,609.27

Stonebriar Centre (North Dallas Area)  
2601 Preston Road, Space 2148  
Frisco, TX 75034  

$22,586.51

Lakeline Mall  
11200 Lakeline Mall Drive – Space C02A  
Ceder Park, TX 78613  

$20,118.53

Barton Creek Square Mall  
2901 S. Capital of Texas Highway, Space A06B  
Austin, TX 78746  

$25,537.37

Tysons Corner Center  
1961 Chain Bridge Road  
McLean, VA 22101  

$48,396.97

The Fashion Center at Pentagon  
1100 S. Hayes Street – Space Y02  
Arlington, VA 22202  

$43,619.01

Chesterfield Towne Center  
11500 Midlothian Turnpike,Suite 150  
Richmond, VA 23235  

10% of Sales

Mayfair Mall  
2500 N. Mayfair Rd.  
Wauwatosa, WI 53226  

$33,405.03

# Schedule 5
## Pending Litigation

Neema Clothing, Ltd. v. Bachrach Acquisition LLC
New York Supreme Court
Index No. 104757/08

Shayne Industries (USA) Inc.
v. Bachrach Acquisition
New York Supreme Court
Index No. 105063/09

JFC Traders Inc.
d/b/a Imperial Neckwear
v. Bachrach
Civil Court of the City of New York
Index No. 65036/09
Index No. 65035/09
Index No. 65034/09
Index No. 65033/09

Fox Valley Mall LLC v.
Bachrach Acquisition, LLC
In the Circuit Court of the Eighteenth Judicial Circuit
Du Page County, Illinois
Index No.  2009L000453

GMAC Commercial Finance, LLC v.
Bachrach Acquisition, LLC
Supreme Court State of New York
County of New York
Index No. 09-650170

# Schedule 6

**BACHRACH ACQUISITION, LLC**
Cash Flow Projection

| | Post-Petition | | | | |
|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | **Wks 1 - 4** |
| | Estimate | Estimate | Estimate | Estimate | 4 Weeks Thru |
| Week-Ending: | 05/10/09 | 05/17/09 | 05/24/09 | 05/31/09 | 05/31/09 |
| Cash Collected - From Operations | $351,596 | $507,097 | $509,353 | $488,300 | $1,856,346 |
| Credit Card Processor Deposit | - | (175,000) | - | - | (175,000) |
| Total Cash Collected | 351,596 | 332,097 | 509,353 | 488,300 | 1,681,346 |
| *Memo:* Sales Tax Collected | 32,647 | 34,154 | 31,777 | 32,256 | 130,835 |
| **Cash Disbursements:** | | | | | |
| Total Payroll & Benefits | - | 197,000 | 156,000 | 181,000 | 534,000 |
| Other Employee-Related Expenses | - | 35,000 | 5,000 | 5,000 | 45,000 |
| Customer Liabilities (GC's, returns, etc.) | - | 20,000 | 20,000 | 20,000 | 60,000 |
| Rent | - | - | - | - | - |
| Utilities/Utility-Deposit | - | - | - | 100,000 | 100,000 |
| Merchandise & Freight Costs | - | 79,000 | 45,672 | 24,000 | 148,672 |
| Other Operating Costs | - | 6,094 | 10,000 | 10,000 | 26,094 |
| Sales Taxes | - | - | 120,000 | - | 120,000 |
| Bankruptcy Professionals & UST Fees | - | - | - | - | - |
| Total Bank Fess | - | - | - | - | - |
| Total Cash Disbursments | - | 337,094 | 356,672 | 340,000 | 1,033,766 |
| Net Cash Surplus(Shortage) | $351,596 | ($4,997) | $152,682 | $148,300 | $647,581 |