## ASSET PURCHASE AGREEMENT IN BANKRUPTCY

ASSET PURCHASE AGREEMENT, dated as of January 11, 2010 ("Agreement"), by and among B&B Bachrach, LLC, a California limited liability company in formation ("Purchaser") and Bachrach Acquisition LLC, a New York limited liability company ("Seller").

### WITNESSETH:

WHEREAS, the Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 to 1532 (the " Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York District (Manhattan) (the " Bankruptcy Court") on May 6, 2009 (the "Petition Date"), in Case No. 09-12918 (the " Bankruptcy Case");

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Purchaser desires to purchase from the Seller, and the Seller desires to sell to Purchaser, substantially all of the Seller's assets in exchange for the payment to the Seller of the Purchase Price and the assumption by Purchaser of the Assumed Liabilities; and;

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to this Agreement and a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereby agree as follows:

### ARTICLE I. DEFINITIONS

1.1. Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Assumed Cure Amount" means, with respect to each Purchased Lease, Purchased Contract or all amounts payable in order to cure any monetary defaults existing as of the date of

1

assumption and assignment in respect of such Purchased Lease, Purchased Contract or, as approved by the Bankruptcy Court and as set forth on Schedule 1.1.

"Assumed Administrative Payables" means post petition administrative obligations of Seller (including, but not limited to Seller's obligation to remit sales proceeds for Consignment Inventory, as said term is defined below) and any and all amounts due Wells Fargo to the extent that its loan balance exceeds $3,500,000 (payment to Wells Fargo shall be made prior to payment of any other Assumed Administrative Payables) and as set forth on Schedule 1.1(a) but in no event more than the total amount of $1,000,000 in the aggregate.).

"Assumed Professional Payment" means the payment to Professionals in the sum of $500,000, payable pursuant to terms to be set forth in a note (the "Professional Note") in a form acceptable to Purchaser.

"Bid Deadline" means the date as set by the Bankruptcy Court in the Bankruptcy Case.

"Bidding Procedures" means the bidding procedures in a form acceptable to Purchaser.

"Bidding Procedures Hearing" means the Bankruptcy Court hearing to consider entry of the Bidding Procedures Order.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures in a form acceptable Purchaser.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Business Name" means "Bachrach" either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, and any confusingly similar variation, derivative or translation thereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, purchase order, sales order or other agreement, written or oral, other than a Lease.

"Consignment Inventory" means inventory for which the Seller is in possession, pursuant to a consignment agreement, and identified by Seller with specific SKU numbers and as shown in Schedule 1.1(a) (Consignment).

"Creditors' Note" means the unsecured promissory note in the sum of $450,000 in a form acceptable to Purchaser. The Creditors' Note shall be payable to Seller for Seller's distribution to its creditors and claimants in order of priority as set forth in the Bankruptcy Code) .

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment agreements, consulting agreements or any other compensation agreement for an individual service provider, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, retention, change in control, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other benefit, plans or arrangements.

"Employees" mean all individuals, as of the date of this Agreement, who are employed by the Seller.

"Environmental Laws" means all Laws relating to the environment, natural resources, or safety or health of humans or other living organisms (with respect to exposure to Hazardous Materials).

"Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any organization which is, or was (at a relevant time), a member of a controlled group of organizations with the Seller within the meaning of Sections 414(b), (c), (m), or (o) of the Code, or which would be considered to be a single employer with the Seller pursuant to Section 4001(b) of ERISA.

"Excluded Contract" means those Contracts listed by Purchaser as listed on Schedule 1.1(b).

"Excluded Lease" means a Lease listed by Purchaser as listed on Schedule 1.1(c), as such schedule may be amended or modified from time to time in accordance with the terms hereof.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired, and no such appeal, motion or petition is pending.

"GAAP" means generally accepted accounting principles in the United States.

3

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Materials" means any pollutant, contaminant, hazardous substance, hazardous waste, medical waste, special waste, toxic substance, petroleum or petroleum-derived substance, waste or additive, asbestos, PCBs, radioactive material, or other compound, element, material or substance in any form whatsoever (including products) regulated, restricted or addressed by or under any applicable Environmental Law.

"Intellectual Property" means all U.S. and non-U.S.: (a) patents, patent applications and statutory invention registrations, including reissues, divisions, continuations, continuations in part, renewals, extensions and reexaminations thereof, all patents that may issue on such applications, documented unpatented invention disclosures, and all rights therein provided by international treaties or conventions; (b) trademarks, service marks, trade dress, logos, Internet domain names, any and all common law rights thereto, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing, including the Business Name, together with all goodwill associated with and symbolized by the foregoing ("Trademarks"); (c) copyrightable works, copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; (d) proprietary information, including Trade Secrets, processes and know-how; (e) Software; (f) datasets, databases and related documentation, including the Data; and (g) other intellectual property and proprietary rights, including rights of privacy and publicity, in each case existing on the date hereof and the Closing Date for purposes of Sections 5.7 and 10.1, and on the Closing Date for purposes of Section 2.1.

"Inventory" means any and all inventory, supplies, finished goods and goods-in-transit.

"Knowledge of Seller" means the actual knowledge, after reasonable inquiry, of those individuals identified on Schedule 1.1(d).

"Law" means any federal, state, provincial, local, municipal, foreign international, multinational or other law, statute, code, constitution, treaty, ordinance, Order, rule or regulation or common law principle or requirement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of the Seller to possess, use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

4

"Leases" means all leases, subleases, licenses and other agreements to which any Seller is a party, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which any Seller has the right to possess, use or occupy any Leased Real Property.

"Legal Proceeding" means any action, suit, litigation, investigation, audit, hearing, proceeding or claim (whether public or private and whether civil, criminal, administrative or arbitral) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"Liability" means any debt, liability, obligation, commitment, expense, claim, guaranty or endorsement (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal or first offer, easement, servitude, restrictive covenant, encroachment, hypothecation, debt, levy, indenture, proxy, voting trust or agreement, transfer restriction or encumbrance or any other similar restriction of any kind.

"Local Time" means the prevailing local time in the State of New York.

"Multiemployer Plan" has the meaning set forth in ERISA § 4001(a)(3).

"Next Best Bidder" shall mean a Qualified Bid that is selected as the back-up Bid by the Seller at an auction.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permits" means any approvals, authorizations, consents, licenses, permits, grants, clearances, orders or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" means any information relating to an identified or identifiable natural person; an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to such person's physical, physiological, mental, economic, cultural or social identity, such as full name, national identification number, telephone number, street address, e-mail address, IP address, driver's license number, face, fingerprints, or handwriting or credit card numbers.

"Proceeds" means the definition proscribed by NY UCC §9102(a)(64).

5

"Professionals" means counsel for the Seller, counsel for the Official Committee of Unsecured Creditors, the financial advisors to the Seller as appointed by order dated June 9, 2009 in the Bankruptcy Court and the financial advisors to the Official Committee of Unsecured Creditors as appointed by order dated August 5, 2009 in the Bankruptcy Case.

"Professionals' Note" means the unsecured promissory note for the Assumed Professional Payment in the sum of $500,000.

"Purchased Contracts" means all Contracts, to which any Seller is a party, other than those set forth on Schedule 1.1(b).

"Purchased Leases" means those Leases listed on Schedule 1.1(c), as the same may be updated by Purchaser from time to time, and which are assumed and assigned to Purchaser pursuant to the Sale Order together with all rights and interests of the Seller relating thereto, whether held directly by the Seller or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, and to the extent the following are assignable, fixtures, systems, equipment and items of personal property of the Seller attached or appurtenant thereto, and associated with such Purchased Leases).

"Purchaser Material Adverse Effect" means any event, circumstance, state of facts, change or occurrence which has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the Transactions or perform its obligations under this Agreement.

"Qualified Bid" means a Qualified Bid as defined in the Bidding Procedures Order. This Agreement shall be deemed to be a Qualified Bid.

"Sale Order" shall mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Seller to consummate the Transactions. Without limiting the generality of the foregoing, such Sale Order shall find and provide, among other things, that (a) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens, claims and interests (other than Permitted Encumbrances and Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code, such Liens, claims and interests to attach to the Purchase Price; (b) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (c) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (d) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof, as provided in Section 12.4 hereof; and (e) this Agreement and the Transactions may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, any Seller or any Chapter 7 or Chapter 11 trustee of any Seller. In addition, to the extent permitted by Section 365 of the Bankruptcy Code, the Sale Order shall approve and authorize the assumption and assignment of the Purchased Contracts and the Purchased Leases such that the Purchased Contracts and Purchased Leases will be in full force and effect from and after the Closing with any non-Seller parties being barred and enjoined from asserting

against Purchaser, among other things, defaults, breaches or claims (including cure claims under Section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing.

"Seller Material Adverse Effect" means any event, circumstance, state of facts, change or occurrence which has had, or would reasonably be expected to have, individually or in the aggregate, (a) a material adverse effect on the Purchased Assets (or the Seller's business conducted in respect thereof) or the Assumed Liabilities (in each case, taken as a whole) or (b) a material adverse effect on the ability of the Seller to consummate the Transactions or perform their obligations under this Agreement, other than, in either case, (i) any change in the United States or foreign economies or financial markets in general; (ii) any change that generally affects the industry or business in which any Seller generally competes; (iii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) any change in applicable Laws or accounting rules; (v) any actions taken or proposed to be taken by Purchaser or any of its Affiliates; (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Transactions; or (vii) any effect arising directly as a result of the filing of the Bankruptcy Case; provided that in the case of each of clauses (i) through (iv), that such event, circumstance, fact, change or occurrence does not disproportionately impact the Seller, taken as a whole, as compared to other companies operating in the industry in which the Seller operate.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all documentation including user manuals and other training documentation related to any of the foregoing.

"Tax Authority" means any Governmental Body charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, charges, duties, customs, levies or other assessments, fees, imposts or other similar charges imposed by a Tax Authority or other Governmental Body including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheat, capital gains, productions, customs, goods and services, windfall profits, premium, workers compensation, disability, alternative minimum, add-on and estimated taxes, and any liability for Taxes as a transferee or successor, by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax, deficiency assessments or additional amounts imposed by any Tax Authority or other Governmental Body in connection with any item described in clause (a) or (b).

"Tax Return" means any returns, declarations, reports, estimates, claim for refund, information returns and statements in respect of any Taxes (including any schedules or attachments thereto or amendments thereof).

"Termination Date" means March 15, 2010; provided that if the Sale Order is entered by the Bankruptcy Court on or prior to such date, "Termination Date" shall mean the date that is twenty (20) days after the date the Sale Order is entered by the Bankruptcy Court.

"Trade Secrets" shall mean any and all trade secrets, including any non-public and confidential information, technology, information, know-how, proprietary processes, formulae, algorithms, models or methodologies constituting trade secrets, customer lists, and all rights in and to the same.

"Transaction Expenses" means Purchaser's documented fees and expenses (including attorneys', accountants', financial advisors' and other consultants' fees) incurred in connection with the investigation of the Seller and the Purchased Assets, the preparation, negotiation, and execution of this Agreement and / or the consummation of the Transactions.

"WARN Act" means the Worker Adjustment and Retraining Notification Act and any similar foreign, state or local Law.

"Weatherproof Note" means the unsecured promissory note in the sum of $200,000, in a form acceptable to the Purchaser.

1.2 Other Definitional and Interpretive Matters.

(a) Unless otherwise expressly provided in this Agreement, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) Time of the Essence, Calculation of Time Period. Each party hereto acknowledges and agrees that time is of the essence for each and every provision of this Agreement and that the breach of any provision hereof requiring any act to be done or step to be taken within a certain period or prior to a certain date or time shall be deemed a material breach of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Dollars. Any reference in this Agreement to $ means U.S. dollars.

(iii) Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this

Agreement, which Exhibits and Schedules will be prepared as of the date of execution of the Agreement and all of which shall be updated and approved by the Seller and Purchaser as of Closing .

(iv) Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi) Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii) Ordinary Course. The term "ordinary course of business" with respect to any of the Seller shall mean, when referring to, or with respect to, periods after the Petition Date (but not periods prior to the Petition Date), the ordinary course of business of such Seller in accordance with its conduct after the Petition Date.

(b) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

ARTICLE II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1. Purchase and Sale of Assets.

(a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall sell, transfer, convey, assign and deliver to Purchaser, all of the Seller's right, title and interest in, to, under and with respect to the Purchased Assets, free and clear of all Liens, claims and interests (other than Permitted Encumbrances and Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

(b) For all purposes of and under this Agreement, the term "Purchased Assets" means all of the properties, assets and rights of the Seller (other than the Excluded Assets) existing as of the Closing, of any kind or nature, real or personal, tangible or intangible, including the following:

9

(i) all cash and cash equivalents, including cash in transit, marketable securities and deposits;

(ii) all accounts, notes and other receivables;

(ii) all Proceeds and other amounts receivable pursuant to or in respect to the Inventory and Equipment;

(iii) all Inventory (whether owned by, or on order to be delivered to Seller), (the "Purchased Inventory");

(iv) all Purchased Leases

(v) all Purchased Contracts;

(vi) all Equipment (whether owned by, or on order to be delivered to, any Seller), or any other Equipment expressly excluded from the Purchased Assets in writing by Purchaser after the date hereof;

(vii) all Intellectual Property, all rights to sue and recover for past, present and future infringements, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including any Intellectual Property licensed to any Seller (the "Purchased Intellectual Property");

(viii) all Documents that are used in, held for use in or intended to be used in, or that relate to, the Purchased Assets, the Assumed Liabilities or the business or operations of the Seller, including Documents relating to products of the Seller, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises subject to this Agreement, but excluding any Documents exclusively related to an Excluded Asset. Notwithstanding for foregoing, the Seller and/or its representative or successors shall have access to all Documents, upon reasonable notice, for the purposes of completing the Bankruptcy Case and for preparing and filing any Governmental Body report or filing.

(ix) all Permits relating to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(x) all assets held under or with respect to a Seller Employee Benefit Plan (and Seller's rights with respect to such assets), including any insurance policies providing life, short-term and/or long-term disability insurance and the health plans maintained by the Seller, if, and only if, such Seller Employee Benefit Plan is, in each case, identified on Schedule 2.1(b)(ix) (such identified Seller Employee Benefit Plans, collectively, the "Assigned Benefit Plans and Policies") and all rights under all other insurance policies relating to the Purchased Assets and all rights of every nature and description under or arising out of such policies (including proceeds therefrom). As of date of execution of this Agreement, it is not contemplated that there will be any Seller Employee Benefit Plan for the Purchaser to acquire.

(xii) all claims and rights of action arising under Chapter 5 of the Bankruptcy Code, including any proceeds thereof;

(xiii) to the extent not included in the Purchased Intellectual Property, all goodwill and other intangible assets, including all goodwill associated with the Business Name and the other Purchased Intellectual Property;

(xiv) Omitted

(xv) all Leasehold Improvements on the Purchased Leases;

(xvi) all other tangible or intangible assets that are not Excluded Assets;

(xvii) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the Seller or with third parties to the extent relating to the Purchased Assets (or any portion thereof), to the extent assignable, and including all rights, benefits and claims under any agreements regarding confidentiality and restrictions on the conduct of third parties with respect to competition with the Seller and solicitation of employees of the Seller entered into in connection with the Bankruptcy Case.

2.2. Excluded Assets. Notwithstanding Section 2.1 above, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Seller shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a) the Purchase Price delivered to Seller pursuant to this Agreement;

(b) all Inventory, Equipment and other tangible assets listed on Schedule 2.2(b);

(c) all Excluded Leases and Excluded Contracts listed on Schedule 2.2(c);

(d) all Documents exclusively related to any Excluded Asset;

(e) all Documents and Contracts, including personnel files, relating exclusively to Employees who do not become Transferred Employees (provided, that the Seller shall provide Purchaser with reasonable access to the same to the extent permitted by Law and reasonably requested by Purchaser, including the right to make copies thereof at Purchaser's expense; provided, further, that Purchaser shall keep such information confidential in accordance with the standards it uses for the Transferred Employees and otherwise in accordance with all requirements of applicable Law);

(f) subject to Section 2.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court), such consent has not been obtained, including but

not limited to Consignment Inventory; in the event the consent pertaining to Consignment Inventory is not obtained, Purchaser shall have the sole right, but not the obligation, to pay the consignor directly at Closing and to deduct said amount(s) for the limit set forth for the Assumed Administrative Payables;

(g) all rights under all insurance policies related exclusively to the Excluded Assets and all rights of every nature and description under or arising out of such policies (including proceeds therefrom);

(h) any rights, claims or causes of action of the Seller relating solely and exclusively to any Excluded Assets (including the proceeds thereof, other than any proceeds described in Section 2.1(b)(iii)) and arising out of events occurring prior to, on or after the Closing Date, including any rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent exclusively relating to products sold, or services provided, to the Seller and exclusively relating to any other Excluded Assets.

(i) any shares of capital stock or other equity interests of the Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Seller;

(j) any minute books, stock ledgers, corporate seals and stock certificates of the Seller, and other similar books and records that the Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings (provided, that the Seller shall provide Purchaser with reasonable access to the same to the extent reasonably requested by Purchaser, including the right to make copies thereof at Purchaser's expense);

(k) all assets held under or with respect to any Seller Employee Benefit Plan (and the Seller's rights with respect to such assets) that is not one of the Assigned Benefit Plans and Policies;

(l) any rights of the Seller under this Agreement; and

(m) the assets of the Seller, if any, set forth on Schedule 2.2(m), which Purchaser shall, in its sole and absolute discretion, have the right to update prior to the Closing Date.

2.3. Assumption of Liabilities. On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, the following (and only the following) Liabilities of the Seller (without duplication) existing as of the Closing (collectively, the "Assumed Liabilities") and no others:

(a) all Liabilities of the Seller (including Liabilities in respect of customer and security deposits and prepaid items) under the Purchased Contracts, Purchased Leases, Assigned Permits, and Assigned Benefit Plans and Policies that accrue and are required to be performed on or after the Closing Date (except for Liabilities that were not incurred in the ordinary course of business consistent with past practice); as shown only on Schedule 2.3(a);

(b) all Assumed Administrative Payables as shown only on Schedule 1.1(a);

12

(c) all Transaction Costs;

(d) all Liabilities arising from ownership of the Purchased Assets from and after the Closing Date;

(c) all Liabilities arising from employment of the Transferred Employees from and after the Closing Date; and

(f) all Assumed Cure Amounts as shown and limited by Schedule 1.1 but in no event greater than the sum of $125,000.00.

(g) all Liability for the Assumed Professional Payment.

Notwithstanding the foregoing and for the avoidance of doubt, to the fullest extent permitted under the Bankruptcy Code, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of Law by, or any Legal Proceeding against, any Seller or any breach, default or violation by the Seller prior to the Closing Date of or under any Purchased Contracts, Purchased Leases, Assigned Permits and Assigned Benefit Plans and Policies other than the Assumed Cure Amount.

2.4. Excluded Liabilities. For the avoidance of doubt, Purchaser shall not assume and shall be deemed not to have assumed, and the Seller shall be solely and exclusively liable with respect to, any and all Liabilities of the Seller other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities include, and the Assumed Liabilities do not include, the following:

(a) Liabilities existing prior to the Closing Date, other than any such Liabilities existing prior to the Closing Date expressly assumed by Purchaser pursuant to Section 2.3;

(b) all Liabilities relating to or arising out of the ownership or operation of an Excluded Asset;

(c) all Liabilities for Taxes of the Seller relating to the Purchased Assets for any Tax periods (or portions thereof) ending on or before the Closing Date;

(d) all Liabilities under or with respect to (i) any Employee Benefit Plan other than Assumed Liabilities with respect to the Assigned Benefit Plans and Policies, (ii) Sections 412, 4971 and 4980B of the Internal Revenue Code, 26 U.S.C. §§ 1 et seq. (the "Code"), or Title IV or Section 302 of ERISA with respect to any Employee Benefit Plan that is or has been maintained or contributed to by any of the Seller or any ERISA Affiliate, and (iii) any current or former employees of the Seller and their compensation and benefits, including any severance, retention, change in control, bonus or incentive or similar payments due or that become payable in connection with;

(e) any post-petition debt or administrative expense debt that is not an Assumed Liability, exclusive of the Assumed Administrative Payables;

13

(f) any Liability accruing prior to the Closing Date to the extent that Seller is actually reimbursed therefor under its insurance policies;

(g) any damages or Liabilities arising out of, or in connection with, any litigation or other claims pending against Seller on or prior to the Closing Date exclusive of the Assumed Administrative Payables;

(h) except to the extent specifically provided in Article IX, all Liabilities arising on or prior to the Closing Date out of, relating to or with respect to any Transferred Employees including in relation to (i) the employment by or performance of services for the Seller, or termination of employment or services, or (ii) workers' compensation claims relating to occurrences on or prior to the Closing Date;

(i) any Liability arising out of, or in connection with, a violation of any Law occurring on or prior to the Closing Date, including any violations of law relating to occupational safety and health or discrimination on the basis of age, race, creed, color or disability, or any conduct prohibited by the Foreign Corrupt Practices Act of 1977;

(j) any Liability under the Worker Adjustment and Retraining Notification Act (or any similar state or local law) arising on or prior to the Closing Date or out of the transactions contemplated hereby;

(k) to the maximum extent permitted by Law, all Liabilities under Environmental Laws (including, but not limited to, administrative or judicial fines or penalties for violations of Environmental Laws, and remediation or response costs for contamination) arising on or prior to the Closing Date;

(l) all Liabilities of the Seller under this Agreement, including Liabilities relating to amounts required to be paid by any Seller hereunder;

(m) all trade payables (other than the Assumed Administrative Payables_and Assumed Cure Costs) and all other Liabilities expressly described as Excluded Liabilities in this Agreement; and

(n) all Liabilities under or relating to any reclamation or similar claim.

(o) all Liabilities for fees or costs, if any, awarded to the Professionals in excess of the Assumed Professional Payment.

2.5. Lease Designation; Cure Amounts.

(a) Omitted

(b) Assignment and Assumption. At such time as is specified in the Sale Order, this Agreement and any other Orders of the Bankruptcy Court, the Seller shall assume and_assign to Purchaser, the Purchased Leases.

(c) The Seller appoints Purchaser as agent-in-fact for the sole purpose of allowing Purchaser to continue to operate under the Leases.

(d) From and after the date hereof until the Closing Date, the Seller shall not assume (or pay any cure amounts in connection therewith), amend, modify or reject or seek to assume, amend, modify or reject any Purchased Lease without the prior written approval of Purchaser.

2.6. Non-Assignment of Assets. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than the Seller (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Purchaser thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required. In such event, the Seller will use its commercially reasonable best efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request. If such Necessary Consent is not obtained, or if such Purchased Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of the Seller thereunder so that Purchaser would not in fact receive all such rights, the Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which Purchaser would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Purchaser, or under which the Seller would enforce for the benefit of, and at the direction of, Purchaser, with Purchaser assuming the Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of the Seller thereunder. If with respect to any Purchased Asset such Necessary Consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure to pay Assumed Cure Costs, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price, unless, in the commercially reasonable business judgment of the Purchaser, that the lack of such Necessary Consent will render the intention and purpose of this Agreement to be fustrated.

2.7. Further Conveyances and Assumptions.

(a) The Seller shall deliver to Purchaser at the Closing personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such Transferred Employees into Purchaser's records and all other Documents included in the Purchased Assets.

(b) At the Closing, and from time to time following the Closing, the Seller and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to sell,

transfer, convey, assign and deliver fully to Purchaser and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to the Seller and their successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective or evidence the Transactions.

## ARTICLE III. CONSIDERATION; ADJUSTMENT

3.1. Consideration.

The aggregate consideration for the Purchased Assets shall be an amount in cash equal to $3,000,000 (the "Cash Consideration") together with the assumption of the Assumed Liabilities, the issuance of the Creditors' Note, the issuance of the Weatherproof Note (collectively the "Purchase Price").

3.2. Payment of Purchase Price. On the Closing Date, Purchaser shall make the payments described in Section 4.3(a). The Cash Consideration shall be wired to Wells Fargo Bank or elsewhere as may be set forth in the Sale Order as per instructions delivered prior to the Closing. The balance of the Purchase Price shall be delivered at Closing.

(A) Purchase Price Deposit. Upon the execution of this Agreement, pursuant to the terms of the Bidding Procedures Order, Purchaser shall deliver to Purchaser's counsel cash equal to $1,000,000 wire transfer of immediately available funds (the "Deposit Amount"). Pursuant to the Bidding Procedures Order, counsel shall deliver or allocate the Deposit Amount as follows:

(a) if the Closing shall occur, (i) 100% of the Deposit Amount shall be applied towards the Purchase Price;

(b) if this Agreement is terminated for any reason other than Purchaser's default, 100% of the Deposit Amount shall be refunded to the Purchaser.

## ARTICLE IV. CLOSING AND TERMINATION

4.1. Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place, and Purchaser and the Seller shall consummate the Transactions, at the offices of Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, 1065 Avenue of the Americas 18th Floor, New York, NY 10018 (or at such other reasonable place as Purchaser may designate in writing at least two (2) Business Days prior thereto) at 2:00P.M. (EST) on the date that is one (1) Business Day following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing

by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

4.2. Deliveries by the Seller. At the Closing, the Seller shall deliver to Purchaser:

(a) one or more duly executed Bills of Sale, in form and substance customary for transactions of this nature and reasonably acceptable to Purchaser and the Seller;

(b) such number of duly executed assignment and assumption agreements in form and substance customary for transactions of this nature and reasonably acceptable to Purchaser and the Seller (each an "Assignment and Assumption Agreement") and duly executed and notarized assignments of the trademark and patent registrations and applications included in the Purchased Intellectual Property registered in the name of the Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), and general assignments of all other Purchased Intellectual Property, as Purchaser shall reasonably request;

(c) the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(d) affidavits executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445 of the Code and the Treasury Regulations.

4.3. Deliveries by Purchaser. At the Closing, Purchaser shall deliver, or cause to be delivered to the Seller:

(a) the Cash Consideration, by wire transfer of immediately available funds to the account or accounts specified in the Sale Order;

(b) the Creditors' Note;

(c) the Professionals' Note;

(d) the Weatherproof Note;

(e) executed counterparts of the Bills of Sale;

(f) executed counterparts of the Assignment and Assumption Agreements;

(g) the officer's certificate required to be delivered pursuant to Sections 10.2(a) and 10.2(b);

(h) such other documents, instruments and certificates as the Seller may reasonably request to transfer, assign and delegate the Purchased Assets and Assumed Liabilities to Purchaser in accordance with the terms and conditions hereof.

17

4.4. Termination of Agreement. This Agreement may (or shall, as the case may be) be terminated prior to the Closing as follows:

(a) by Purchaser, if the Bidding Procedures Order shall not have been entered by the Bankruptcy Court on or prior to January 31, 2010;

(b) by Purchaser, if (i) the Bankruptcy Court hearing for the Sale Order shall not have commenced on or prior to Feburay 26, 2010 or (ii) the Sale Order shall not have been entered on or prior to March 15, 2010;

(c) by Purchaser, if the Bidding Procedures approved by the Bidding Procedures Order or the Bidding Procedures Order is amended or modified (without Purchaser's prior written consent) in a manner that could reasonably be expected to have a material adverse impact on Purchaser;

(d) by Purchaser or the Seller, if the Closing shall not have occurred by the close of business on the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Seller, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(d);

(e) by mutual written consent of the Seller and Purchaser;

(f) by Purchaser, if any condition to the obligations of Purchaser set forth in Sections 10.1 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(g) by the Seller, if any condition to the obligations of the Seller set forth in Sections 10.2 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by the Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by the Seller;  .

(h) by Purchaser, if there shall be a breach by the Seller of any representation or warranty or any covenant or agreement of any Seller contained in this Agreement which would result in a failure of a condition set forth in Sections 10.1 or 10.3 and which breach (if curable without cost (including by way of any increase to the Purchase Price resulting therefrom) to Purchaser) has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by Purchaser to the Seller of such breach and (ii) the Termination Date, provided that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 4.4(h) if Purchaser is then in material breach of this Agreement;

(i) by the Seller, if there shall be a breach by Purchaser of any representation or warranty or any covenant or agreement of Purchaser contained in this Agreement which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach has not been cured (if curable without cost to the Seller) by the earlier of (i) five (5) Business Days after the giving of written notice by the Seller to Purchaser of such breach and (ii) the Termination Date provided that the Seller shall not have the right

to terminate this Agreement pursuant to this Section 4.4(i) if the Seller are then in material breach of this Agreement;

(j) by the Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(k) automatically, without any action by Purchaser or Seller, if (i) the Bankruptcy Court approves a Competing Transaction which Competing Transaction does not close within ten (10) Business Days of said approval or (ii) the Seller withdraws or seek authority to withdraw their motion seeking approval of the transactions or file a plan contemplating the reorganization or sale of all or any part of any Seller under the Bankruptcy Code inconsistent with the Transactions.

4.5. Procedure Upon Termination. In the event of termination pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties and this Agreement shall (except to the extent provided elsewhere herein) terminate, and the Transactions shall be abandoned, without further action by Purchaser or the Seller. If this Agreement is terminated as provided herein, each party shall destroy or redeliver all documents, work papers and other written material of any other party relating to the Transactions, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6. Effect of Termination. In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or the Seller except as otherwise provided in Section 7.2 and in the Bidding Procedures Order, if entered; provided, however, that the provisions of Section 7.2, and Section 8.7 and Article XII hereof shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 4.6 shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to Purchaser as of the date herof, except in all cases as disclosed in the schedules attached hereto, that:

5.1. Organization and Good Standing. Seller is (i) an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted and (ii) duly licensed or qualified to do business as a foreign corporation, company or partnership (as applicable) and is in good standing in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification or license, except, in the case of

clause (ii), for such failures to be licensed, qualified or in good standing as would not, individually or in the aggregate, have a Seller Material Adverse Effect.

5.2. Authorization of Agreement. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, the Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party and to perform its obligations hereunder. The execution and delivery of this Agreement by the Seller and each other agreement, document or instrument contemplated hereby to which it is a party (the "Seller Documents") and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Seller. No other corporate proceedings on the part of the Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement and each Seller Document has been duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery by the other parties hereto, the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court) this Agreement and each Seller Document constitute legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with its terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3. Conflicts; Consents of Third Parties.

(a) Subject to Bankruptcy Court approval and except as set forth on Schedule 5.3(a), the execution and delivery by the Seller of this Agreement and each other Seller Document, the consummation of the Transactions, or compliance by the Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, give rise to a right of termination, acceleration or cancellation or result in the loss of any benefits or creation of any Lien upon any of the properties or assets of any Seller under, any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller; (ii) subject to entry of the Sale Order any Order of any Governmental Body applicable to such Seller or any of the properties or assets of such Seller; or (iii) subject to entry of the Sale Order, any applicable Law, except for such conflicts, violations, defaults, rights of termination, acceleration or cancellation, loss of benefits, or Liens which would not, individually or in the aggregate, have a Seller Material Adverse Effect.

(b) Subject to Bankruptcy Court Approval, except (i) as set forth on Schedule 5.3(b) and (ii) to the extent not required if the Sale Order is entered or any other Order is entered by the Bankruptcy Court, no material consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Seller in connection with the execution and delivery of this Agreement or any other Seller Document, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and

20

notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.4. Absence of Changes.

Except as set forth on Schedule 5.4, since the Petition Date, Seller has not taken any action that required the approval of the Bankruptcy Court without having obtained such approval except for such actions as would not, individually or in the aggregate, have a Seller Material Adverse Effect.

5.5. Purchased Assets. Except as set forth on Schedule 5.5, and Consignment Inventory, Seller owns good and marketable title to the Purchased Assets and, subject to the entry of the Sale Order, Purchaser will be vested with good and marketable title to such Purchased Assets and be permitted to dispose of the Closing Store Assets, free and clear of all Liens (except for Permitted Encumbrances and Assumed Liabilities) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Subject to the receipt of any Necessary Consents, the Purchased Assets include all of the assets that are necessary to operate the business of the Seller conducted at the stores covered by the Purchased Leases.

5.6. Taxes. Except for matters that would not have, individually or in the aggregate, a Seller Material Adverse Effect, (i) Seller has timely filed all material Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller), and all such Tax Returns are correct and complete in all respects; and (ii) except as to Taxes of Seller the payment of which is prohibited or stayed by the Bankruptcy Code, each Seller has paid all material Taxes due and payable by it (whether or not such Taxes are shown on any Tax Return). Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

5.7. Intellectual Property.

Except as set forth on Schedule 5.7, to the Knowledge of Seller, Seller owns or have valid licenses to use all material Purchased Intellectual Property used by them in the ordinary course of Seller's business. Except as set forth on Schedule 5.7, as of the date hereof, no claims are pending against Seller before a Governmental Body or, to the Knowledge of Seller, threatened with regard to the ownership by Seller of any material Purchased Intellectual Property.

5.8. Employee Benefits.

Schedule 5.8(a) sets forth a complete and correct list of all Employee Benefit Plans contributed to by the Seller or any ERISA Affiliate in respect of or for the benefit of employees of the Seller.

Other than as set forth on Schedule 5.8(b), no Title IV Plan is a "multiemployer pension plan," as defined in Section 3(37) of ERISA, nor is any Title IV Plan a plan described in Section 4063(a) of ERISA.

21

5.9. Litigation. Except as set forth on Schedule 5.9, (a) there are no (and, during the two years preceding the date hereof, have not been any) material Legal Proceedings pending or, to the Knowledge of the Seller, threatened against the Seller or any Purchased Assets in which the maximum amount claimed or in controversy exceed $100,000; and (b) the Seller is not subject to any Order that would have a Seller Material Effect.

5.10. Brokers. The Seller has no obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions For the avoidance of doubt, no such compensation shall constitute Assumed Liabilities.

5.10-5.15 Omitted

5.16. Permits. Schedule 5.16(a) attached hereto sets forth all material Permits issued or granted to the Seller in connection with the operation of the Seller's businesses as currently conducted. To the Knowledger of Seller, except as set forth on Schedule 5.16(a), (i) all such Permits are validly held by the Seller, and the Seller has complied with all terms and conditions thereof, and (ii) during the past two years, the Seller has not received notice relating to the revocation or modification of any such Permits. To the Knowledge of Seller, the Seller possess all Permits it is required to possess, to own or hold under lease and operate its businesses as currently conducted.

5.17. Affiliate Transactions. Except as set forth on Schedule 5.17 attached hereto, to the Knowledger of Seller, no officer, director, shareholder or Affiliate (other than another Seller) of any Seller, immediate family member of the foregoing Persons, or Affiliate of any of the foregoing Persons is a party to any Contract with any of the Seller (other than Employee Benefit Plan arrangements disclosed on Schedule 5.8(a) or Schedule 5.11) or has any material interest in any Purchased Asset.

5.18-5.19 Omitted

5.20    No Other Representations or Warranties; Schedules. Except for the representations and

warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Seller's business, the Purchased Assets, the Assumed Liabilities or the Transactions, and the Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or its Affiliates respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), the Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent,

consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Seller's business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Seller Material Adverse Effect.

5.21    Condition of the Purchased Assets. Notwithstanding anything contained in this Agreement to the

contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the business of the Seller and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation and not subject to further due diligence or financing.

ARTICLE VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Seller that:

6.1. Organization and Good Standing. Purchaser will be by the Sale Order Approval Date (as defined below) (i) an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted and (ii) duly licensed or qualified to do business as a foreign corporation, company or partnership (as applicable) and is in good standing in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification or license, except, in the case of clause (ii), for such failures to be licensed, qualified or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

6.2. Authorization of Agreement. Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party and, subject to the entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, to perform its obligations hereunder. The execution and delivery of this Agreement by Purchaser and each other agreement, document or instrument contemplated hereby to which it is a party (the "Purchaser Documents") and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser. No other corporate proceedings on the part of Purchaser are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement and each Purchaser Document has been duly and validly executed and delivered by Purchaser and (assuming the due authorization,

execution and delivery by the other parties hereto, the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court) this Agreement and each Purchaser Document constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3. Conflicts; Consents of Third Parties.

(a) Except as set forth on Schedule 6.3(a), the execution and delivery by Purchaser of this Agreement and each other Purchaser Document, the consummation of the Transactions, or compliance by Purchaser with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, give rise to a right of termination, acceleration or cancellation or result in the loss of any benefits or creation of any Lien upon any of the properties or assets of Purchaser under, any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser; (ii) subject to entry of the Sale Order or any other Order entered by the Bankruptcy Court, any Contract, Lease or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) subject to the entry of the Sale Order, any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser; or (iv) subject to the entry of the Sale Order, any applicable Law, except with respect to clauses (ii), (iii) and (iv) for such conflicts, violations, defaults, rights of termination, acceleration or cancellation, loss of benefits, or Liens which would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

(b) Except (i) as set forth on Schedule 6.3(b) and (ii) to the extent not required if the Sale Order is entered or any other Order is entered by the Bankruptcy Court, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or any other Purchaser Document, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4. Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

ARTICLE VII. BANKRUPTCY COURT MATTERS

7.1. Competing Transaction.

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids with respect to any transaction involving the direct or indirect sale, transfer or other disposition of a material portion of the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a plan of reorganization or liquidation) the consummation of which would be substantially inconsistent with the Transactions (a "Competing Transaction"). Nothing contained herein shall be construed to prohibit Seller and its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Transaction

7.2. Bidding Procedures; Break-Up Fee and Transaction Expenses.

(a) Upon execution of this Agreement, the Seller will file this Agreement with the Bankruptcy Court. The Seller shall use commercially reasonable efforts, and Purchaser will reasonably cooperate with the Seller, to obtain the entry of the Bidding Procedures Order no later than
_____. The Seller shall use commercially reasonable efforts, and Purchaser will reasonably cooperate with the Seller, to ensure that the Bankruptcy Court hearing for the Sale Order is commenced no later than _____ and the Sale Order is entered by the Bankruptcy Court as soon as possible following the date on which the auction (if held) is conducted, but in no event later than _____ Local Time on _____. After the auction (if held), the Seller will take all commercially reasonable actions to cause the Closing to occur as soon as pratical. In the event the entry of the Sale Order or the Bidding Procedures Order is appealed, the Seller shall use its commercially reasonable efforts to contest such appeal, and Purchaser will reasonably cooperate with the Seller in such efforts.

(b) In the event that the Purchaser is not deemed to provide the highest and best bid for the Purchased Assets at an auction, at closing of a sale of the Purchased Assets to another bidder, the Seller's counsel, shall pay, without further order in the Bankruptcy Case from the funds obtained from the deposit or closing of a sale of the Purchased Assets, which ever is first to occur, to another bidder, to Purchaser, by wire transfer of immediately available funds an amount equal to $200,000 (the "Break-Up Fee") and the Deposit Amount shall forthwith, without the need for any order in the Bankruptcy Case, be released to the Purchaser.

7.3. Sale Order. Purchaser agrees that it will promptly take such commercially reasonable actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, the Seller shall use its respective commercially reasonable efforts to defend such appeal.

ARTICLE VIII. COVENANTS

8.1. Access to Information. Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees, consultants, agents, financing sources, advisors and representatives, including its legal advisors and accountants (collectively, " Purchaser's Representatives") (provided that such Purchaser's Representatives are subject to confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of the Confidentiality Agreement applicable to Purchaser or are otherwise bound by obligations of confidentiality), to make such investigation and examination of the properties, business and operations (including customers, suppliers, employees and other business relations) of the Seller and such investigation and examination of the books and records of the Seller, the Purchased Assets, the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities as it requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice and shall be subject to restrictions under applicable Law. The Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination (including, if requested by Purchaser, promptly arranging meetings or telephone calls with business relations of the Seller as requested by Purchaser), and Purchaser and Purchaser's Representatives shall cooperate with the Seller and its representatives and shall use their commercially reasonable efforts to minimize any disruption to the Seller's business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require the Seller to disclose information prohibited from disclosure by Law. In the event that the disclosure of any information pursuant to this Section 8.1 would jeopardize any attorney-client privilege, the parties will cooperate in customary arrangements to preserve such privilege.

8.2. Conduct Pending the Closing.

(a) Except as required by applicable Law, or (i) as otherwise expressly contemplated by this Agreement, or (ii) with the prior written consent of Purchaser or the approval of the Bankruptcy Court, during the period from the date of this Agreement to and through the Closing Date, Seller shall conduct its business only in the ordinary course; and use its commercially reasonable efforts to (A) preserve its present business operations, organization and goodwill, and (B) preserve its present relationships with customers and suppliers.

(b) Except (i) as required by applicable Law, (ii) as otherwise contemplated by this Agreement or (iii) with the prior written consent of Purchaser or the approval of the Bankruptcy Court, Seller shall not:

(A) increase the annual level of compensation payable or to become payable by Seller to any of its directors or executive officers, (B) grant any bonus, benefit or other direct or indirect compensation to any director or executive officer, (C) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar

agreement (or amend any such agreement) to which the Seller is a party or involving a director or executive officer of the Seller, except, in each case, as required by any of the Employee Benefit Plans;

      (i)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

      (ii)    make or rescind any material election relating to Taxes, settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or, except as may be required by the Code or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent audited financial statements or Tax Returns, as applicable;

      (iii)    subject any of the Purchased Assets to any Lien, except for existing Liens;

      (iv)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset other than customer accounts receivable compromised in the ordinary course of the business of Seller;

      (v)    enter into any commitment for capital expenditures in excess of $100,000;

      (vi)    engage in any transaction with any officer, director or Affiliate of its Seller or any such individual; or

      (vii)    agree to do anything prohibited by this Section 8.2 or do or agree to do anything that would cause Seller's representations and warranties herein to be false in any material respect.

8.3. Consents. The Seller shall use commercially reasonable efforts, and Purchaser shall reasonably cooperate with the Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals referred to in Section 5.3(b) hereof.

8.4. Regulatory Approvals-Omitted.

8.5. Further Assurances. Subject to the other provisions of this Agreement, (i) Purchaser shall use its commercially reasonable efforts to cause the fulfillment at the earliest practicable date of all of the conditions set forth in Section 10.2 and Section 10.3 and (ii) the Seller shall use commercailly reasonable efforts to cause the fulfillment at the earliest practicable date of all of the conditions set forth in Section 10.1 and Section 10.3.

8.6. Preservation of Records. In the application of commercially reasonable efforts, Seller or its successors and Purchaser agree that each of them shall preserve and keep the records held by it or their

Affiliates relating to the Purchased Assets for three (3) years after the Closing Date (except as provided below) and shall make such records available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of the Seller or Purchaser or any of their Affiliates or in order to enable the Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby. In the event the Seller or Purchaser wishes to destroy such records before or after that time, such party shall first give thirty (30) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 30-day period, to take possession of the records within sixty (60) days after the date of such notice.

8.7. Publicity. None of the parties hereto shall issue any press release or make any public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other parties hereto, which approval will not be unreasonably withheld or delayed, unless disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof. If requested by Purchaser, Purchaser and the Seller will negotiate in good faith regarding a press release to be jointly issued by Purchaser and the Seller at the Closing.

8.8. Name Change-Omitted

## ARTICLE IX. EMPLOYEES AND EMPLOYEE BENEFITS

9.1. Transferred Employees. From and after the date hereof, Purchaser may offer employment, effective as of the Closing, and on such terms and conditions as Purchaser may determine in its sole and absolute discretion, to any person employed by the Seller. If the Closing occurs, any such individuals who accept such offer no later than five days after the Closing Date are hereinafter referred to as the "Transferred Employees."

9.2. Employment Tax Reporting. With respect to Transferred Employees, Purchaser and the Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

9.3. Benefits. At Closing, Purchaser may, but is not obligated to, make available or establish an employee benefit plan or plans for the Transferred Employees and their eligible dependents (the "Purchaser Plans"). If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Purchaser Plans providing benefits to Transferred Employees, Purchaser may credit each Transferred Employee with his or her years of service with the Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. In addition, to the extent it has the right to do so, Purchaser may (a) waive under any health plans

maintained by Purchaser for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre-existing condition limitations and eligibility waiting periods were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that the dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs and disclosed to Purchaser by or on behalf of such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Purchaser's health plans.

9.4. No Obligations. For the avoidance of doubt, nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee.

9.5. No Third Party Beneficiary. No provision in this Article IX shall (a) create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of the Seller, Purchaser or any other Person, (b) constitute or create, or be deemed to constitute or create, an employment agreement, (c) constitute or be deemed to constitute an amendment to any Employee Benefit Plan sponsored or maintained by the Seller or Purchaser, or (d) alter or change the employment at-will status of Employees.

## ARTICLE X. CONDITIONS TO CLOSING

10.1. Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of the Seller contained in this Agreement (i) that are not qualified by materiality or Seller Material Adverse Effect shall be true and correct in all material respects on and as of the date hereof and the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such earlier date) and (ii) that are qualified by materiality or Seller Material Adverse Effect shall be true and correct in all respects on and as of the date hereof and the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b) the Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c) the Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d) no Seller Material Adverse Effect shall have occurred since the date of this Agreement;

(e) the Seller shall have obtained (and delivered reasonable evidence thereof to Purchaser) all consents, waivers and approvals set forth on Schedule 10.1(e);

(f) all consents, approvals or conditions that are not eliminated by the Sale Order and that are required for the assignment and assumption of the Purchased Assets shall have been obtained or satisfied;

(h) omitted; and

(i) the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, in form and substance reasonably satisfactory to Purchaser, and each such Order shall be final and non-appealable.

10.2. Conditions Precedent to Obligations of the Seller. The obligations of the Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Seller in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Purchaser contained in this Agreement (i) that are not qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all material respects on and as of the date hereof and the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such earlier date) and (ii) that are qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all respects on and as of the date hereof and the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date and the Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c) Purchaser shall have delivered, or caused to be delivered, to the Seller all of the items set forth in Section 4.3.

10.3. Conditions Precedent to Obligations of Purchaser and the Seller. The respective obligations of Purchaser and the Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser and the Seller in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b) the Bankruptcy Court shall have entered the Sale Order and (ii) the Sale Order shall have become a Final Order (provided that Seller shall be deemed to have automatically waived the requirement under clause (ii) unless (and then only for so long as) the Sale Order shall be subject to a stay); and

(c) omitted.

10.4. Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's material breach of any provision of this Agreement.

## ARTICLE XI. TAXES

11.1. Seller shall use its commercially reasonable efforts to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under section 1146(a) of the Bankruptcy Code. To the extent that the Transactions are not otherwise exempt under Section 1146(a) of the Bankruptcy Code, Purchaser shall be liable for all sales, use and other transfer Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "Transfer Taxes"). Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes and shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

11.2. Purchase Price Allocation. Purchaser shall determine the allocation of the Purchase Price among the Purchased Assets in accordance with a statement (the "Allocation Statement") to be provided by Purchaser to the Seller within 120 days after the Closing, which Allocation Statement shall be prepared in accordance with the principles of Section 1060 of the Code. So long as the Allocation Statement is prepared in accordance with the principles of Section 1060 of the Code, Purchaser and the Seller shall file all Tax Returns (including Form 8594) on a basis that is consistent with the Allocation Statement, and shall take no position inconsistent therewith for Tax purposes unless required by an administrative or judicial determination.

11.3. Cooperation and Audits. The Seller and the Purchaser agree to furnish, or cause their Affiliates, officers, employees, agents, auditors and representatives to furnish, to each other upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) reasonably requested, including such information reasonably necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any Tax authority or other Governmental Body, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. The Seller and the Purchaser shall reasonably cooperate, or cause their Affiliates, officers, employees, agents, auditors and representatives to reasonably cooperate, with each other in the conduct of any audit or other proceeding related to Taxes

and each shall execute and deliver such other documents as are necessary to carry out the intent of this Section 11.3. The Seller and the Purchaser shall provide, or cause their Affiliates, officers, employees, agents, auditors and representatives to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets for any Tax period for which the other party may have liability under this Agreement. The Seller and the Purchaser shall furnish, or cause their respective Affiliates, officers, employees, agents, auditors and representatives to furnish, to each other, copies of all correspondence received from any Tax Authority or other Governmental Body in connection with any Tax audit, assessment or litigation or information request with respect to any Tax period for which the other party or its Affiliates may have liability under this Agreement.

ARTICLE XII. MISCELLANEOUS

12.1. No Survival of Representations and Warranties. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed prior to, at or after the Closing shall survive the Closing, and each party hereto shall be liable to the other after the Closing for any breach thereof.

12.2. Expenses. Except as otherwise provided in this Agreement, the Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions.

12.3. Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to seek injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements, or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 12.3 shall be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement. For purposes of clarity, this Section 12.3 shall not be deemed to limit any party's right to terminate this Agreement pursuant to Section 4.4 or the rights of Purchaser under Section 7.2(b).

12.4. Submission to Jurisdiction; Consent to Service of Process.

Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.8 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.5    Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.6    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.7. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed entirely in such State.

33

12.8. Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier for next day delivery(with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):
If to any Seller:

Bachrach

_____
_____

with copies (which shall not constitute notice) to:

Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP
1065 Avenue of the Americas 18th Floor
New York, NY 10018

If to Purchaser, to:

B&B Bachrach LLC
4921 Eastern Avenue
Bell, California 90201

with a copy (which shall not constitute notice) to:

David L. Prince, Esq.
1912 E. Vernon Ave., #100
Los Angeles, California 90058

12.9. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible,

12.10. Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Seller or

Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser may, without the consent of any other Person, (a) assign some or all of its rights and/or obligations hereunder to one or more of its Affiliates and/or any subsequent purchaser of Purchaser, its business and/or a material portion of its assets; and (b) assign its rights under this Agreement to any lender(s) providing financing to Purchaser and/or any of its Affiliates for collateral security purposes. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to such Seller or Purchaser shall also apply to any such assignee unless the context otherwise requires. In the event that a Chapter 11 trustee should be appointed for the Seller, or in the event that the Seller's Chapter 11 case should be converted to a case under Chapter 7, the obligations of the Seller hereunder shall be binding upon such trustee or successor Chapter 7 estate.

12.11. Counterparts; Electronic Delivery. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine or electronic mail (any such delivery, an "Electronic Delivery"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties in one of the delivery methods contemplated by Section 12.8. No party hereto or to any such agreement or instrument shall raise (a) the use of Electronic Delivery to deliver a signature or (b) the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery, as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

PURCHASER:                                      SELLER
B&B Bachrach, LLC  (in formation)              Bachrach Acquisition, LLC


_____,                        _____
Organizer, but not as an individual            Brian Lipman
                                               President