KELLEY DRYE & WARREN LLP
Eric R. Wilson (EW-4320)
Robert L. LeHane (RL-9422)
Jason R. Adams (JA-2952)
101 Park Avenue
New York, New York 10178
Tel:  (212) 808-7800
Fax: (212) 808-7897

Hearing Date: January 28, 2010 10:00 a.m.
Objection Deadline: January 27, 2010 at 4:00 p.m.

Counsel for the Official Committee of Unsecured
Creditors of Bachrach Acquisition, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BACHRACH ACQUISITION, LLC<br><br>       Debtor. | Chapter 11<br><br>Case No. 09-12918 (SMB) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTOR'S APPLICATION PURSUANT TO SECTIONS 105(A), 363, AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR (I)
ENTRY OF AN ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE
SALE OF ASSETS, (B) APPROVING CERTAIN BID PROTECTIONS, (C)
SCHEDULING AN AUCTION AND SALE HEARING, AND (D) APPROVING THE
FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER AUTHORIZING
AND APPROVING (A) THE DEBTOR'S ENTRY INTO A CERTAIN ASSET
PURCHASE AGREEMENT, (B) THE SALE OF ASSETS FREE AND CLEAR OF LIENS
AND OTHER INTERESTS, AND (C) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND LEASES**

The Official Committee of Unsecured Creditors (the "Committee") of Bachrach

Acquisition, LLC (the "Debtor"), by and through its undersigned counsel. Kelley Drye & Warren

LLP, hereby objects (the "Objection") to the Debtor's Application Pursuant to Sections 105(a),

363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 for (I) Entry

of an Order (A) Establishing Bidding Procedures for the Sale of Assets, (B) Approving Certain

Bidding Protections, (C) Scheduling an Auction and Sale Hearing, and (D) Approving the Form

and Manner of Notice Thereof; and (II) an Order Authorizing and Approving (A) the Debtor's Entry Into a Certain Asset Purchase Agreement, (B) the Sale of Assets Free and Clear of Liens and Other Interests, and (C) Assumption and Assignment of Certain Executory Contracts and Leases (the "Sale Motion").  In support of the Objection, the Committee respectfully states the following:

## PRELIMINARY STATEMENT

1.      After multiple representations to this Court and the Committee, including in its three requests for extensions of exclusivity, that the Debtor was in the process of formulating a plan of reorganization which would be funded through additional financing, investments and/or a transaction, the Debtor has now submitted the Sale Motion promoting a transaction which, if approved, will leave this estate without any possibility of confirming a plan, leaves the estate administratively insolvent, and will unquestionably lead to the immediate conversion or dismissal of this Chapter 11 case.  The Debtor's proposed procedures are geared less towards establishing a robust auction than a *fait accompli*.  This case is now being run for the sole benefit of Wells Fargo Bank, the Debtor's secured lender ("Wells Fargo") and the Debtor's insiders.  The Committee submits that the Debtor has no intention of obtaining the highest and best offer for its assets, but instead is solely focused on closing a transaction with B&B Bachrach, LLC (the "Purchaser"), an entity which is 25% controlled by the Debtor's current insiders (the "Insiders").  This transaction will (i) grant the Insiders full releases by transferring all chapter 5 avoidance actions to the Purchaser without the Insiders providing any consideration to the unsecured creditors; (ii) leave the estate administratively insolvent, with no cash or assets to pay administrative creditors or fund the orderly wind down of the Debtor's

estate; and (iii) provide absolutely no return for the estate with all cash proceeds being transferred to Wells Fargo.

2.     The Committee cannot sit by while the Debtor pays only lip service to its fiduciary duties by fostering a sale that is nothing more than a poorly disguised *sub rosa* plan.  If the proposed transaction with the Purchaser is ultimately approved, distributions to creditors, or the lack thereof, will be decided, all chapter 5 avoidance actions will be transferred to the Purchaser, the Insiders will be given full releases, and the estate will be left with no means of administration.  The Debtor should not be permitted to utilize Section 363 of the Bankruptcy Code and hand all assets to an entity controlled by the Insiders, free and clear of all encumbrances, and grant full releases to the very individuals that led the Debtor into this bankruptcy.  Instead, the Debtor should be compelled to submit such a proposal to a vote of its creditors as part of a plan process in which the Debtor must satisfy its burdens under section 1129 of the Bankruptcy Code.

3.     Mindful of the dwindling resources available for the administration of this estate, the Committee believes it is appropriate to set forth at length its objection to the underlying sale notwithstanding the fact that the Debtor is presently only seeking approval of sale and bid procedures and certain bid protections.  The Committee is concerned that if the Debtor is permitted to pursue the proposed transaction over the next month, significant time and resources will be exhausted pursuing a transaction that should not be approved.

4.     In addition, the Committee had significant objections to the proposed bidding procedures contained in the Sale Motion because they were not designed to maximize value to the estate or foster a true auction and bidding process.  These objections include (i) a lack of aggressive marketing in light of the fact that the Purchaser is partially-controlled by the

Insiders, including the Debtor's Chief Executive Officer, (ii) a lack of sufficient time to market the assets to ensure that the Insider transaction is truly the highest and best offer, and (iii) an unnecessary break up fee that is intended to chill bidding rather than foster it and is tainted by self-dealing. After discussions with the Debtor, the Committee believes it has come to an agreement on mutually agreeable procedures and protections to the extent that the sale process goes forward, as discussed in more detail below.

**STATEMENT OF FACTS**

**A.**     **Procedural History**

5.     On May 6, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtor has continued to operate and manage its business as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     On May 22, 2009, the United States Trustee appointed the Committee. On August 5, 2009, the Court entered an order authorizing the Committee to retain Kelley Drye & Warren LLP as its counsel, *nunc pro tunc* to May 27, 2009.

7.     On June 23, 2009, the Court entered a Final Order Authorizing Debtor-in-Possession to Incur Post-Petition Secured Indebtedness, to Grant Security Interest and Priority Claims Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, Modifying Automatic Stay and Approving Agreements with Wells Fargo Bank, National Association acting though its Wells Fargo Business Credit Operating Division (the "Final DIP Order"). [Docket Entry No. 113.] Pursuant to the Final DIP Order, the Court authorized the Debtor to borrow up to $6.5 million from Wells Fargo, substantially all of which was a roll up of the Debtor's pre-petition existing indebtedness and granted to Wells Fargo first and senior liens and security interests in

and to certain collateral. The Final DIP Order further provided that the Wells Fargo collateral and super-priority claims shall not include any avoidance actions and/or claims which have or may be commenced under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code nor the proceeds thereof. (Final DIP Order at ¶ 3).

**B.**      **Extensions of Exclusivity**

8.      Since filing its petition, the Debtor has requested three extensions of its exclusive periods to file a plan of reorganization and solicit votes. On August 13, 2009, the Debtor filed an Application For Entry of an Order Authorizing Extensions of Debtor's Exclusive Periods Pursuant to 11 U.S.C. §1121(d)(1) and (2) (the "<u>First Extension Application</u>") seeking a ninety (90) day extension of the exclusive periods to file a plan and solicit votes thereon. [Docket Entry No. 149.] The Debtor stated that it was in discussions with numerous parties about investing additional capital to fund a plan of reorganization. The First Extension Application also stated that the Debtor would monitor sales at its closing stores as well as negotiate lease modifications in order to be in a position to negotiate a plan of reorganization with Wells Fargo and the Committee. (First Extension Application at ¶¶ 11, 12). The First Extension Application was granted by the Court on August 25, 2009 and the Debtor's exclusive right to file a plan was extended to October 30, 2009, which was further extended to November 30, 2009 by an amended Scheduling Order dated October 27, 2009.

9.      On October 30, 2009, the Debtor filed its Second Application For Entry of an Order Authorizing Extensions of Debtor's Exclusive Periods Pursuant to 11 U.S.C. §1121(d)(1) and (2) (the "<u>Second Extension Application</u>") pursuant to which the Debtor sought an additional thirty-five (35) day extension of the exclusive right to file a plan. [Docket Entry No. 291.] The Debtor stated that it was negotiating with Wells Fargo and various investors with

respect to the formation of a plan and believed that it had secured both financing and additional investment(s) necessary to fund a plan.  (Second Extension Application at ¶ 12).  The Second Extension Application was granted by the Court on November 20, 2009 and the Debtor's exclusive right to file a plan was extended to December 11, 2009, which was further extended to January 13, 2010 by the Second Amended Scheduling Order, dated November 18, 2009.

10.     On December 10, 2009, the Debtor filed a Third Application For Entry of an Order Authorizing Extensions of Debtor's Exclusive Periods Pursuant to 11 U.S.C. §1121(d)(1) and (2) (the "Third Extension Application") pursuant to which the Debtor sought an additional sixty (60) day extension of the exclusive right to file a plan.  [Docket Entry No. 360.] In the Third Extension Application, the Debtor stated that it had been negotiating a transaction, upon which a plan of reorganization would be based, that would allow the Debtor's existing business to continue in its current form and would be funded by a third party.  A hearing on the Third Extension Application was held on January 14, 2010, at which the Court granted the extension until February 9, 2010.

C.     **The Sale Motion**

11.     On January 19, 2010, the Debtor filed the Sale Motion.  [Docket Entry No. 382.]  The Sale Motion seeks, in the first instance, approval of certain proposed bidding and auction procedures and bid protections and, thereafter, approval of the sale of substantially all of the Debtor's assets to the Purchaser.

12.     On January 20, 2010, the Court entered the Order Scheduling Expedited Hearing and Shortening Time, which granted the Debtor's request to shorten notice on the Sale Motion.  [Docket Entry Nos. 381 and 383.]

13. According to the Sale Motion, the Purchaser is a limited liability company formed for the purpose of acquiring the assets of the Debtor and consists of two members, one of which consists of several Insiders of the Debtor, including Mr. Brian Lipman, the current President and Chief Executive Officer of the Debtor. (Sale Motion at ¶ 15).

14. The Sale Motion indicates that prior to the Petition Date, the Debtor explored multiple options regarding the Debtor's business including obtaining an additional equity investment, obtaining additional debt financing and negotiating with several entities towards the purchase of its assets. The Sale Motion claims that, prior to filing the Sale Motion, the Debtor "again marketed its assets to several potential strategic and financial buyers and established an electronic data room for those interested parties." (Sale Motion at ¶¶ 8, 10). The Sale Motion, however, provides no detail regarding the prior marketing efforts of the Debtor or explains what, if any, continuing marketing efforts will be undertaken by the Debtor and its financial advisor prior to the proposed bid deadline other than sending the sale notice and bidding procedures to entities that previously expressed an interest in the Debtor's assets.

D. **The Asset Purchase Agreement**

15. Attached as <u>Exhibit C</u> to the Sale Motion is a form of asset purchase agreement between the Debtor and the Purchaser (the "<u>APA</u>"). The Debtor has filed neither an executed APA nor any of the schedules thereto with the Court.

16. The APA provides for the sale of substantially all of the Debtor's assets to the Purchaser free and clear of all liens pursuant to section 363(f) of the Bankruptcy Code. Purchased Assets[1] are defined in the APA as all of the properties, assets and rights of the Seller (other than Excluded Assets) existing as of the close and include (i) all cash and cash

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

equivalents, (ii) all accounts, notes and other receivables, (iii) all proceeds and other amounts receivable pursuant to or in respect of inventory or equipment, (iv) all inventory, and (v) all chapter 5 avoidance actions. Purchased Assets also include certain Purchased Contracts and Purchased Leases which will presumably be identified on the yet to be filed schedules. As a result, it is impossible to know exactly which assets the Purchaser is acquiring. Similarly, until the schedules are filed, it is impossible to discern which, if any, assets are Excluded Assets and, as such, are not included in the sale to the Purchaser.

17.     In consideration for the Purchased Assets, the Purchaser will (i) pay cash in the amount of $3 million; (ii) assume up to $1 million of the post-petition administrative obligations of the Debtor[2]; (iii) issue an unsecured note in the amount of $450,000 payable to the Debtor to be distributed to its creditors (the "Creditors' Note"); (iv) issue an unsecured note in the amount of $200,000 for payment to Weatherproof (the "Weatherproof Note"); (v) pay certain cure amounts up to a total of $125,000 (the "Assumed Cure Amounts"); and (vi) issue an unsecured note in the amount of $500,000 for the payment of the Debtor's professionals (the "Professionals' Note").[3]

18.     Section 3.2 of the APA requires that all cash proceeds from the sale will be wired to Wells Fargo. The Sale Motion provides no information regarding the current amount of the Debtor's post-petition administrative obligations or whether $1 million is sufficient to cover all administrative expenses. Since the filing of the Sale Motion, the Debtor's professionals

---

[2]     Prior to the payment of an administrative obligations, the APA provides that the $1 million will first be used to satisfy any obligations under the DIP in excess of $3.5 million. The Debtor's professionals have informed the Committee that the current balance of the DIP is approximately $3.9 million, although the Debtor expects the balance to be approximately $3.6 million at the closing of a transaction. Therefore, less than $1 million of administrative claims will ultimately be assumed by the Purchaser.

[3]     The Debtor's professional have informed Committee counsel that the Professionals' Note has been changed such that $250,000 will be funded in cash and $250,000 will be funded via an unsecured note from the Purchaser. As of the time of this filing, the Committee has received no evidence of this change.

have disclosed that administrative expenses will be significantly in excess of $1 million and are projected to be in the range of $1.2 to $1.4 million.

19.     The APA also fails to provide any details regarding the terms of the Creditors' Note, the Weatherproof Note or the Professionals' Note other than the principal amount of such notes and the fact that they will be unsecured obligations of the Purchaser. Instead, the notes must be "in a form acceptable to the Purchaser." A term sheet previously provided to the Committee indicated that the notes would be for 3 year terms. The Sale Motion and the APA also fail to indicate how cure costs will be paid if they exceed the $125,000 threshold in the APA in light of the transfer of all sale proceeds to Wells Fargo.

20.     Section 7.2 of the APA provides for a $200,000 break-up fee to be paid if the Purchaser is not deemed to provide the highest and best bid. However, nothing in the APA requires the Purchaser to serve as a back-up bidder if the Purchaser presents the second highest bid at auction. Furthermore, although all other potential bidders are required to submit a 10% deposit to Debtor's counsel, the Purchaser was not required to submit a deposit and instead is required to deliver a deposit to its own counsel.

## OBJECTION

21.     Upon the commencement of a chapter 11 case, a debtor owes a fiduciary duty to its creditors, which duty requires a debtor to maximize the value of the bankruptcy estate by selling the debtor's property to the highest and best bidder. *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997). Where, as here, the Debtor's Insiders are clearly not motivated by their fiduciary duty to all creditors to maximize value but instead are pursuing a transaction littered with self-interest and personal benefits, the Court should carefully

scrutinize the underlying transaction and the procedure proposed by the Debtor to ensure that the estate is fully protected.

22.     Although 363 sales are common, "there must be some articulated business justification for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." *Committee of Equity Security Holders v. The Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983). The sale of assets outside the ordinary course of business ultimately requires proof that (i) there is a sound business purpose for the sale; (ii) the proposed sale price is fair; (iii) the debtor has provided adequate and reasonable notice; and (iv) the buyer has acted in good faith. *Id*. The Committee submits that the Debtor has not and cannot meet this standard.

23.     Although sales to fiduciaries are not *per se* prohibited, they are subject to heightened scrutiny because they are rife with the possibility of abuse. *In re Bidermann*, 203 B.R. at 551 (*citing C&J Clark America, Inc. v. Carol Ruth, Inc.* (*In r*e *Wingspread Corp.)* 92, B.R. 877, 893); *see also In re Exaeris Inc.*, 380 B.R. 741, 744–746 (Bankr. D. Del. 2008) (the timing, relationship of the purchaser to the debtor, the proposed release of the purchaser, the dearth of evidence of marketing, the absence of any evidence of the value of assets and no evidence about the negotiations require the Court to proceed with extreme caution).

24.     As set forth below, the Committee objects to the Sale Motion on multiple grounds. The Committee objects to commencing a sale process with the Purchaser as a stalking horse until the significant problems with the proposed sale are resolved. Specifically, the Committee objects to (i) the transfer of all chapter 5 avoidance actions to the Purchaser without consideration to the unsecured creditors; (ii) proceeding with a stalking horse offer without an executed APA, any schedules to the APA or any clarity regarding the terms of the various notes

being provided by the Purchaser; and (iii) engaging in a sale process under the guise of a 363 sale in a chapter 11 bankruptcy where the estate will unquestionably be left administratively insolvent after the closing of the sale with no means to effectuate even a simple plan of liquidation. The proposed sale is really a poorly disguised *sub rosa* plan which should be rejected in favor of a plan process.

**I.      THE AUCTION AND SALE PROCESS SHOULD NOT
         BE PERMITTED TO PROCEED**

**A.      Chapter 5 Avoidance Actions Should Not Be Transferred To The Purchaser**

25.      The Committee objects to the transfer of chapter 5 avoidance actions against the Insiders (the "Insider Actions") with no benefit or consideration provided to the unsecured creditors. All claims and rights of action arising under chapter 5 of the Bankruptcy Code, including any proceeds thereof, are included in the Purchased Assets being sold to the Purchaser. *See* §2.1(b)(xii) of the APA. The Committee would not object to the transfer, and waiver, of all non-insider trade preference claims for the benefit of the general unsecured creditors. However, the Committee submits that the true reason for the inclusion of such claims in the Purchased Assets being transferred to the Purchaser, which is owned 25% by the Debtor's current insiders, is to grant such insiders full releases from the Insider Actions without any consideration for general unsecured creditors.

26.      Chapter 5 avoidance actions were explicitly excluded from Wells Fargo's collateral and the super-priority claims granted to Wells Fargo. *See* Final DIP Order at ¶3. Accordingly, all such chapter 5 avoidance actions, including the Insider Actions, are unencumbered and the value of the chapter 5 avoidance actions should benefit general unsecured creditors. Instead, the APA and the Sale Motion propose to include the Insider Actions as Purchased Assets without providing any consideration or benefit to general unsecured creditors.

27. The transfer of the Insider Actions without consideration flowing from such Insiders to the unsecured creditors should not be permitted. The Purchaser should not be deemed the stalking horse unless and until the Insider Actions are excluded from the Purchased Assets or adequate compensation for unsecured creditors can be negotiated in consideration for the releases sought by the Insiders. The Sale Motion provides that "based upon the Debtor's review of its books and records, and the timing of payments made to insiders during the preference period, the Debtor does not believe that any Chapter 5 actions exist against insiders." Sale Motion at ¶ 14. The Committee disagrees and such a statement is disingenuous at best. The Debtor, controlled by one of the Insiders, cannot provide an unbiased analysis of whether the transfers to the Insiders were appropriate. Instead, the analysis and, if necessary, litigation of such Insider Actions are properly left to the Committee or a properly funded post confirmation trust. The transparent motivation of the Insiders is revealed in the Sale Motion: "to the extent that such actions do exist, the Purchaser has indicated that it is unwilling to go forward with the APA with the potential of litigation being commenced against those insiders…." Sale Motion at ¶ 14. Thus, the inclusion of the Insider Actions in the Purchased Assets is motivated solely by the Insiders' desire to avoid potential liability. By agreeing to this requirement without providing consideration to the unsecured creditors for the releases of the claims, the Debtor has abandoned its fiduciary duty to maximize value for all creditors.

28. Given the economic substance of the proposed transaction with the Purchaser and the fact that the consideration being offered will not even cover administrative and priority claims, the Insider Actions are the only potential chance of recovery for unsecured creditors. If the Insiders desire to avoid the potential of litigation in the future by transferring the Insider Actions to the Insider-controlled Purchaser, the Insiders must compensate the general

unsecured creditors for whose benefit such claims exist. Alternatively, the Insider Actions should be excluded from the sale and remain as part of the estate. If the Debtor's assessment proves correct that all transfers to Insiders were proper, the Insiders should have no concerns. However, what is abundantly clear from the inclusion of the Insider Actions in the APA and the refusal of the Debtor and the Purchaser to exclude the Insider Actions from the sale is that the Debtor's conduct in connection with the sale and auction for which the Debtor seeks approval is tainted by self-interest rather than being motivated by the fiduciary duty of the Debtor to maximize value for all creditors.

29.     Accordingly, the Committee objects to the Purchaser's approval as the stalking horse until the Insider Actions are removed from the Purchased Assets or the unsecured creditors are offered meaningful consideration for the releases. Instead, the Insider Actions should be retained by the estate to be properly investigated and, if appropriate, pursued. Such actions may ultimately serve as the only meaningful source of recovery for general unsecured creditors and should not be casually discarded by the Debtor for the benefit of the Insiders and Wells Fargo.

**B.     Proceeding With The Purchaser As A Stalking Horse Should Not Be Permitted Until All Terms Of The Purchaser's Offer Are Disclosed**

30.     The Debtor and the Purchaser have failed to provide sufficient and accurate disclosure regarding critical terms of the proposed transaction without which neither the Committee nor any other interested party can determine the true nature and value of the proposed transaction, making competing offers a practical impossibility. The Sale Motion did not include an executed APA and none of the schedules to the APA were filed by the Debtor. These schedules include important information regarding, among other things: (i) the assets being acquired by the Purchaser, (ii) the administrative obligations that are being assumed by the

Purchaser,[4] (iii) the assets that are being excluded from the sale, (iv) the contracts and leases being assumed and excluded, (v) the liabilities being assumed by the Purchaser, (vi) the Assumed Cure Amounts being paid by the Purchaser, and (vii) any limitations on the representations made by the Debtor and the Purchaser. Without such information, the Committee cannot assess the value of the transaction and what, if any, assets will remain to fund the wind down of the estate. Equally important is the fact that potentially interested parties who may want to participate in an auction have no way of assessing this transaction and submitting a "higher and better" offer. The Committee objects to commencing a sale and auction process without such information being available.

31.     The Committee also objects to the Debtor's lack of disclosure regarding the terms of the various notes being issued pursuant to the APA. This is particularly important considering that no cash proceeds are being preserved for the benefit of the estate and the Debtor is proposing to transfer all chapter 5 avoidance actions to the Purchaser. The Court should not permit the sale process to begin until such information is fully disclosed.

C.      **The Debtor Should Not Be Permitted To Pursue An Insider Sale Which Leaves The Estate Administratively Insolvent And Provides No Means For The Post-Sale Administration Of The Debtor's Estate**

32.     Since the Debtor's filing of the Sale Motion, the Committee has learned that the estate will undoubtedly be left administratively insolvent following a sale to the Purchaser on the terms set forth in the APA. The APA only requires that the Purchaser assume a yet unidentified $1 million of administrative obligations, which includes any obligations owed under the DIP in excess of $3.5 million. The Committee has been informed by the Debtor's

---

[4]     The Committee also questions whether the Purchaser should be entitled to pick and choose which administrative obligations it wants to pay. As discussed in more detail below, this is another instance where the Debtor is seeking avoid the requirements of section 1129 of the Bankruptcy Code as part of a *sub rosa* plan.

professionals that they anticipate that the DIP balance will be $3.6 million at closing – meaning that at most only $900,000 of administrative obligations will be assumed by the Purchaser.

33.     However, the Committee now knows that administrative obligations of the estate will exceed $900,000, at the least by $500,000.  There are an estimated $100,000 to $200,000 of priority claims against the estate.  As a result, at least $600,000 of administrative and priority claims will not be paid from the cash proceeds of the sale or assumed by the Purchaser.  Even assuming the Creditors' Note is eventually paid off in full, administrative and priority claims would not be paid in full.  This estate should not go through a sale process, and the Purchaser and the Insiders should not reap the benefits of a sale, that will result in administrative insolvency and at the same time inappropriately transfer the Insider Actions without consideration for unsecured creditors.

34.     In addition, notwithstanding the Debtor's repeated representations to this Court regarding the Debtor's intention to pursue a plan of reorganization, the Sale Motion is conspicuously silent as to the Debtor's post-sale intentions.  A cursory review of the Sale Motion and the APA reveals that after all of cash proceeds are transferred to Wells Fargo and all of assets and chapter 5 avoidance actions are transferred to the Insider-controlled Purchaser, the Debtor's estate will be left without any cash or an ongoing business to generate revenue and, accordingly, no means of administration.  This Insider transaction will effectively suck the estate dry and leave it with no money for winding down the issues that remain.  In essence, the only remaining options will be the immediate conversion of this case to Chapter 7 or a dismissal of the bankruptcy case.

35.     The certain result of the Debtor's failure to ensure that any funds will be available to properly wind down the estate is that no distributions will ever be made on the

Creditors' Note. The Debtor has offered no explanation as to how the Creditors' Note will be administered. If this bankruptcy case is converted or dismissed after the conclusion of the sale, there will be no mechanism or entity left to administer the Creditors' Note and the creditors will never receive any payment.

36.     The Committee objects to this improper use of Chapter 11 and section 363 of the Bankruptcy Code. Section 363 of the Bankruptcy Code was designed to permit a debtor to sell property of the estate early in the bankruptcy proceeding without the necessity of going through the plan and disclosure process. It was not designed to effectuate a "free and clear" sale to an Insider-controlled entity that serves to only benefit such Insiders and the Debtor's secured lender while leaving the estate administratively insolvent and without any ability to wind down the estate's affairs. Before the Debtor seeks to bestow the benefit of complete releases on the Insiders and pay off Wells Fargo, it must provide reasonable evidence that it will be able to satisfy its administrative obligations and provide a mechanism for making a distribution to creditors pursuant to the Creditors' Note.

### D.     The Proposed Sale Is An Impermissible *Sub Rosa* Plan of Reorganization

37.     Analyzing the proposed sale transaction and the facts of this case as a whole, there can be little doubt that the Debtor is improperly utilizing the proposed sale as a *sub rosa* plan. "[I]t is well established that section 363(b) [of the Bankruptcy Code] is not to be utilized as a means of avoiding chapter 11's plan confirmation procedures." *In re Westpoint Stevens, Inc.*, 333 B.R. 30, 52 (Bankr. S.D.N.Y. 2005). A court should look to the economic substance of a transaction and not its form when deciding whether the transaction is appropriate. The substance of the Debtor's proposed sale reveals the Debtor's intent to impose an unconfirmable plan on its creditors. The Debtor should not be permitted to pursue such a course without following the requirements of the plan confirmation process as structured by the

Bankruptcy Code. The Court should deny the Debtor's requested relief because "[w]here it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section." *Id.* (internal citations omitted).

38.     The proposed sale is unquestionably a *sub rosa* plan. First, the proposed sale and APA dictate the distribution of sale proceeds to Wells Fargo and, through the various notes, the ultimate distributions to creditors. Second, the APA provides for the assumption and payment of specifically scheduled administrative obligations but does not require the payment of all administrative obligations, resulting in the disparate treatment of similarly situated creditors. Third, the APA effectively provides for the complete release of the Insiders by the transfer of the Insider Actions to the Insider-controlled Purchaser. The Debtor should not be permitted to effectuate a *de facto* plan without actually going through the plan process, soliciting the necessary votes and complying with the requirements of section 1129 of the Bankruptcy Code. Accordingly, the Sale Motion should be denied.

## II.    THE PROPOSED BIDDING AND AUCTION PROCEDURES AND PROTECTIONS ARE INAPPROPRIATE

39.     Notwithstanding the Committee's objections articulated above regarding proceeding with a sale transaction, the Committee had significant concerns regarding the procedures and protections being proposed by the Debtor. The Committee believes that they have reached an agreement with the Debtor and Wells Fargo regarding revised procedures that will lessen the Committee's concerns.

40.     The Committee's primary concern involved the lack of a true marketing effort by the Debtor. The Debtor has an obligation to foster a robust auction to ensure the greatest possible recovery for creditors. However, given the nature and terms of the proposed

Insider transaction with the Purchaser, the Committee believed that the Debtor, controlled by the very Insiders that will benefit from their participation in the proposed sale, has no incentive to promote such an auction, but instead, is better served by ensuring that no auction occurs. The Committee also remained skeptical regarding the true extent of the marketing efforts to date and the minimal efforts that would be made prior to the proposed auction. The Sale Motion merely provided that the Debtor would serve a copy of the sale notice and sale procedures on parties that had previously expressed an interest in the Debtor. The Committee did not believe that this satisfied the Debtor's fiduciary duty to creditors to seek out the highest and best possible offer as part of a sale under section 363 of the Bankruptcy Code. *See In re Bidermann Industries U.S.A., Inc.*, 203 B.R. at 551.

41.     Second, given the Debtor's inherent bias in favor of the Insider transaction, the Committee was concerned about the Debtor's unfettered control of the auction process, including the determination of who was a qualified bidder and, if an auction occurs, what bid provided the highest and best offer. The Committee was concerned that if such decisions were left in the hands of the Debtor, the Debtor could easily disqualify potential bidders and make decisions that are not geared towards maximizing creditor recovery in favor of a sale that maximizes Insider benefits.

42.     Third, the Committee did not believe that a $200,000 break-up fee was appropriate, was not designed to foster bidding and was tainted by self-dealing. In *In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (Bankr. S.D.N.Y. 1992), this court held that assessment of a break up fee requires the courts to consider whether the fee (i) hinders and chills bidding rather than fostering it, (ii) is tainted by self-dealing or manipulation, and (iii) is an amount that is reasonable in relation to the proposed purchase price.

43.     The Committee believes that a deal has been reached with the Debtor, the Purchaser and Wells Fargo regarding revised procedures that alleviate these concerns. First, the Debtor's professionals and the Committee's professionals will work together to market the assets prior to the proposed auction, which will allow the Committee to ensure that all possible steps have been taken to bring alternative bids to the table. Second, the Committee, the Debtor or Wells Fargo can each independently qualify a bidder. Third, the highest and best offer will be decided by majority vote of the Committee, the Debtor and Wells Fargo and will be subject to Court review. Finally, the Purchaser has agreed to reduce the break-up fee to $100,000. As set forth above, although the Committee continues to have significant concerns regarding whether proceeding with a sale process is appropriate, to the extent the Court chooses to approve procedures and move forward with the auction process, the Committee believes that these revised procedures will provide the best possibility for a robust auction to occur.

## WAIVER OF MEMORANDUM OF LAW

44.     The Objection does not raise any novel issues of law; therefore, the Committee respectfully requests that the Court waive the memorandum of law requirement of Local Bankruptcy Rule 9013-1(b).

## RESERVATION OF RIGHTS

45.     Nothing contained herein shall constitute a waiver of any of the right or remedies of the Committee under the Bankruptcy Code or applicable law, including, without limitation, the right to supplement this Objection, the right to object at the final sale hearing and the right to seek discovery of the Debtor and the Insiders regarding the matters set forth in this Objection.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) denying the Debtor's request to proceed with a sale process, (ii) denying the attempt to establish the Purchaser as the stalking horse absent the relief requested in this Objection, (iii) amending the requested sale and auction procedures and bidding protections, and (iv) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 27, 2010

                                    KELLEY DRYE & WARREN LLP

                                    By:  _/s/ Eric R. Wilson_____
                                         Eric R. Wilson (EW-4320)
                                         Robert L. LeHane (RL-9422)
                                         Jason R. Adams (JA-2952)

                                    101 Park Avenue
                                    New York, New York 10178
                                    Tel:  (212) 808-7800
                                    Fax: (212) 808-7897

                                    Counsel for the Official Committee of
                                    Unsecured Creditors of Bachrach Acquisition, LLC

## CERTIFICATE OF SERVICE

I, Jennifer D. Raviele, hereby certify that I am not less than 18 years of age, and that service of the foregoing **OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S APPLICATION PURSUANT TO SECTIONS 105(A), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ASSETS, (B) APPROVING CERTAIN BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND SALE HEARING, AND (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER AUTHORIZING AND APPROVING (A) THE DEBTOR'S ENTRY INTO A CERTAIN ASSET PURCHASE AGREEMENT, (B) THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS, AND (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES** was caused to be made on January 27, 2010 as detailed below:

_/s/ Jennifer D. Raviele_
Jennifer D. Raviele

**Via Hand Delivery**

Honorable Stuart M. Bernstein
United States Bankruptcy Court
One Bowling Green, Courtroom 723
New York, NY 10004

**Via Electronic Mail**

_Counsel to the Debtor_
Attn: Henry G. Swergold, Esq. and Cliff Katz, Esq.
Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP
1065 Avenue of the Americas, 18th Floor
New York, NY 10018
e-mail: hswergold@platzerlaw.com
e-mail: ckatz@platzerlaw.com

_Counsel to Wells Fargo Business Credit_
Attn: Jeff Wurst, Esq.
Ruskin Moscou Faltischek P.C.
East Tower, 15th Floor
1424 RXR Plaza
Uniondale, NY 11556-1425
e-mail: jwurst@rmfpc.com